[Civ. No. 44551. Second Dist., Div. Five. Jan. 25, 1977.]

QUEEN OF ANGELS HOSPITAL et al.,
Plaintiffs and Appellants, v.
EVELLE J. YOUNGER, as Attorney General, etc.,
Defendant and Appellant.

**COUNSEL**

J. J. Brandlin, James E. Ryan, Ray E. McAllister, Kaplan, Livingston, Goodwin, Berkowitz & Selvin and Herman F. Selvin for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, and Lawrence R. Tapper, Deputy Attorney General, for Defendant and Appellant.

**OPINION**

**KAUS, P. J.**—Plaintiffs in this action are the Queen of Angels Hospital, a California corporation (Queen), and the Franciscan Sisters of the Sacred Heart, an unincorporated association (Motherhouse). They filed a declaratory relief action against the Attorney General to determine the validity of a lease agreement between Queen and a hospital corporation, W.D.C., as well as the legality of an agreement between Queen and Motherhouse for retirement pay. In answer, the Attorney General admitted the dispute and also challenged Queen's agreement to pay certain fees claimed in connection with the lease. The trial court ruled in favor of plaintiffs on the issues of the lease and the

fees, and in favor of the Attorney General on the issue of the retirement fund. Both sides have appealed.

## FACTS

The facts are not disputed; the materiality of some of the facts is.

Plaintiff Queen of Angels Hospital is a nonprofit corporation, first incorporated in 1927. Plaintiff Franciscan Sisters—Motherhouse—is a religious order, based in Illinois, composed of women of the Roman Catholic faith.

The hospital was established in 1927. In 1932, Queen added a 10-floor wing to its main building. A clinic moved into the new wing. In 1948, the sisters took over operation of the clinic, which remained a separate corporation until 1958. The treatment of clinic patients was supervised by physicians from Queen's medical staff. The overall operation of the hospital included instructing nurses and medical students, operating the clinic, and performing general charitable work.

John Brandlin became Queen's attorney in 1964 or 1965. He was also a lay member of Queen's board of directors. In April 1971—the details will be supplied in the discussion—Queen's board of directors approved a lease to be effective May 1, 1971, between Queen as lessor and W.D.C. Services, Inc., hospital entrepreneurs, as lessee. Queen leased the hospital, excepting the outpatient clinic and a convent house, to W.D.C. for 25 years with 2 options for 10 additional years each. The minimum annual rental guaranteed Queen was $800,000 for the first two years and $1 million a year thereafter.

Queen intends to use a substantial portion of the lease proceeds to establish and operate additional medical clinics in east and south central Los Angeles, which clinics will dispense free medical care, aid and advice to the poor and needy. It is not disputed that an outpatient clinic is not functionally equivalent to a hospital.

In June 1971, Motherhouse submitted a claim for $16 million for the value of the sisters' past services to Queen's board of directors. The board unanimously acknowledged the validity of the claim. In July 1971, an agreement was executed between Queen and Motherhouse, effective May 1971, settling and compromising the claim

for the sisters' past services by agreeing that Queen should pay to Motherhouse $200 per month for each sister in the order over the age of 70 years, plus $200 a month for each lay employee who had worked for the congregation for over 20 years, not to exceed 10 lay employees at any one time.

The pensions are payable to all elderly sisters in the order, whether or not the particular Sister performed services at Queen of Angels Hospital. The initial annual cost of the agreement would be $309,600—in July 1971, there were 129 sisters over the age of 70—and up to $24,000 additional to lay employees.

## DISCUSSION

### 1. *The Hospital*

The Attorney General contends that under its articles of incorporation, Queen held its assets in trust primarily for the purpose of operating a hospital, and the use of those assets exclusively for outpatient clinics would constitute an abandonment of Queen's primary charitable purpose and a diversion of charitable trust assets. As noted, it is not disputed that a "hospital" is not the functional equivalent of an "outpatient clinic."

The rules governing the use of the assets of a nonprofit charitable organization are well established: "[A]ll the assets of a corporation organized solely for charitable purposes must be deemed to be impressed with a charitable trust by virtue of the express declaration of the corporation's purposes, and notwithstanding the absence of any express declaration by those who contribute such assets as to the purpose for which the contributions are made. . . . It follows that . . . [a nonprofit corporation cannot] legally divert its assets to any purpose other than charitable purposes, and said property [is] therefore 'irrevocably dedicated' to exempt purposes within the meaning of the welfare exemption." (*Pacific Home* v. *County of Los Angeles,* 41 Cal.2d 844, 852 [264 P.2d 539].)

"Since there is usually no one willing to assume the burdens of a legal action, or who could properly represent the interests of the trust or the public, the Attorney General has been empowered to oversee charities as the representative of the public, . . . ." (*Holt* v. *College of*

*Osteopathic Physicians & Surgeons,* 61 Cal.2d 750, 754 [40 Cal.Rptr. 244, 394 P.2d 932].)

The Attorney General asserts—and plaintiffs insist—that the articles "determine the uses to which trust funds may be put." The Attorney General also asserts, and plaintiffs are equally adamant, that the character of an institution is to be determined, not alone by the powers of the corporation as defined in its charter, but also by the manner of conducting its activities. (*Lynch* v. *Spilman,* 67 Cal.2d 251, 264 [62 Cal.Rptr. 12, 431 P.2d 636].) Indeed, plaintiffs assert that such a "practical construction is virtually controlling."

With this apparent agreement in principle we turn to an examination of the articles of incorporation and the relevant undisputed facts.

The articles of incorporation, as amended in 1941,[1] provides in relevant part as follows:

"*First:* That the name of said corporation is

QUEEN OF ANGELS HOSPITAL

. . . . . . . . . . . . . . . . . . . . .

" 'Second: That the purposes for which said corporation is formed are:

(1) To establish, . . . own, . . . maintain, . . . and operate a hospital in the City of Los Angeles, . . . to furnish, . . . hospital care, . . . and medical and surgical treatment of every kind and character, and to receive, treat and care for patients, invalids, the aged and infirm, and generally to conduct and carry on, and to do all things necessary or advisable in conducting and carrying on a hospital;

(2) To perform and to foster and support acts of Christian charity particularly among the sick and ailing; to practice, foster and encourage religious beliefs and activities, particularly those of the Holy Roman Catholic Church; to house and care for unprotected and indigent sick, aged and infirm persons regardless of race, creed, sex or age;

---

[1] In 1946 the articles were again amended to provide for succession in the event of liquidation, dissolution or abandonment. The named successors were, in order, a Santa Barbara hospital, a San Francisco hospital, a Los Angeles hospital, and the Roman Catholic Archbishop of Los Angeles.

(3) To educate, . . . nurses and medical students, and to provide facilities for the same;

(4) That it is a·corporation which is not formed for pecuniary gain . . . and any revenue received . . . from the operation and carrying on of said hospital shall be used in improving the same . . . or shall be used in enlarging and improving said hospital and in enlarging the field and scope of its charitable, religious and educational activities;

(5) To lease or purchase any real estate, . . . which may be necessary, proper or useful in carrying out the purposes or for the benefit of the hospital, or as may be deemed to be conducive to the welfare of this corporation; [2]

(6) To . . . receive and hold . . . such . . . property as may be necessary, useful or advantageous in the carrying out of the general purposes or for the benefit of the hospital or as may be deemed to be conducive to the welfare of this corporation; . . . .' "

First, what is most apparent in the articles of incorporation is that the name of the corporation, Queen of Angels Hospital, describes a "hospital." Second, although—as plaintiffs point out—the articles refer to a plural "purposes," the framework of those multiple purposes is the operation of a hospital. Clinics are not even mentioned. Thus, subclause 1 begins and ends with the operation of a hospital. Subclause 2, which begins with the performance of "acts of Christian charity particularly among the sick and ailing," concludes with the conjunctive purpose, "to house and care" for persons, suggesting a hospital facility. Subclause 3, which refers to the education of nurses and medical students, intimates a reference back to the hospital. Most important, subclause 4 provides that "any revenue received . . . from the operation and carrying on of said hospital" shall be used either to improve the hospital or in other charitable religious and educational activities, indicating that the "hospital" would continue, although other activities might be added or expanded.

---

[2]The articles also contain a "parity clause" which provides that the corporation may generally "do all acts and things which may be necessary, proper, useful or advantageous to the full carrying out of the purposes of this corporation, . . . and all objects, purposes and powers specified in each of the clauses . . . shall be regarded but not abridged by any of the objects, powers and purposes . . . ."

Although Queen places much emphasis on this clause, under the usual rules. (Civ. Code, § 3534), this clause must be read in light of the specific enumeration of powers which precedes it.

■ The articles of incorporation alone—without resort to additional evidence—compel the inference that although Queen is entitled to do many things besides operating a hospital, essential to all those other activities is the continued operation of a hospital.

This conclusion is made inescapable by the undisputed additional evidence that, from 1927 when Queen was first incorporated, until 1971, when the lease agreement was entered into, Queen of Angels Hospital Corporation did in fact continuously operate a hospital. Moreover, although Queen did operate a clinic from 1932 to the present time, that clinic was physically housed within the hospital and drew on hospital resources. Finally, the education of nurses and medical students, was in fact performed at the hospital.

Queen also represented to the public that it was a hospital. In its statement to the Franchise Tax Board, it stated that it was in the "business of running a hospital." Similar statements were made to the Internal Revenue Service and Los Angeles county tax authorities. Funds were solicited from the public for the hospital or hospital purposes. Such acts further bind Queen to its primary purpose of operating a hospital. (See *Holt* v. *College of Osteopathic Physicians & Surgeons, supra,* 61 Cal.2d 750, 758.)

In brief, whatever else Queen of Angels Hospital Corporation may do under its articles of incorporation, it was intended to and did operate a hospital and cannot, consistent with the trust imposed upon it, abandon the operation of the hospital business in favor of clinics.

Queen's argument in response does not meet the issue. Plaintiffs point out, as we have noted, that the corporation has multiple "purposes"; that the purpose "to furnish, . . . medical and surgical treatment" is broad enough to authorize the operation of a clinic or clinics and that acts of "Christian charity" encompass all forms of medical aid, care, and advice to the poor and needy. None of the foregoing is disputed. The question is not whether Queen can use some of its assets or the proceeds from the operation of the hospital for purposes other than running a hospital; it certainly can and has. The question is whether it can cease to perform the primary purpose for which it was organized. That, we believe, it cannot do.

Moreover, the issue is not, as plaintiffs contend, whether the operation of clinics serving the poor in the areas in which they live is as worthy a use of charitable funds. We can assume that such operation would be a desirable purpose for a nonprofit corporation. This corporation is,

however, bound by its articles of incorporation. Queen may maintain a hospital and retain control over its assets or it may abandon the operation of a hospital and lose those assets to the successor distributees (*supra,* fn. 1), but it cannot do both.

That the issue is not the desirability of the new use to which Queen wishes to put the trust assets is illustrated by *Holt* v. *College of Osteopathic Physicians & Surgeons, supra,* 61 Cal.2d 750. In *Holt* the purposes stated in the articles of incorporation were to establish and conduct an osteopathic medical and surgical college. (61 Cal.2d at p. 757.) The college operated as an osteopathic school from 1914 until about May 1961, when the trustees decided to delete the word "osteopathic" and to become an allopathic medical school. (*Id.,* at pp. 758-759.)

Although it was not suggested that the teaching of allopathic medicine was in any way a less desirable use of charitable funds than the teaching of osteopathic medicine, the court held: "We have concluded that the complaint states a cause of action for enjoining a threatened breach of a charitable trust. If the allegations of the complaint are true, the charitable purpose of COPS is primarily to conduct a college of osteopathy," and there is "a distinction between osteopathic and allopathic medicine." (*Id.,* at p. 759.)

We think the principle of *Holt* is controlling; here, as in *Holt,* the issue is not whether the new and different purpose is equal to or better than the original purpose, but whether that purpose is authorized by the articles.

■ There is no merit to Queen's alternative contention that the statutes (Corp. Code, §§ 9505, 10207) authorizing the Attorney General to supervise such nonprofit corporations are unconstitutional. There is no authority for plaintiffs' proposition that once a religious group is involved in a nonprofit charitable corporation, the use of that property may not be scrutinized. **(5)** Rather, the rule, as most recently stated in *In re Metropolitan Baptist Church of Richmond, Inc.,* 48 Cal.App.3d 850, 859 [121 Cal.Rptr. 899], is one of neutrality: "Where civil or property rights are involved the courts of this state have always, evenhandedly, accepted jurisdiction over property disputes, even where ecclesiastical questions may have been indirectly involved." (*Id.,* at p. 859.) Where, as here, the dispute does not require "the resolution by civil courts of controversies over religious doctrine and practice," no infringement on the parties' First Amendment rights results. (*Presbyterian Church* v. *Hull*

*Church* (1969) 393 U.S. 440, 449 [21 L.Ed.2d 658, 665, 89 S.Ct. 601]; see also *Kreshik* v. *St. Nicholas Cathedral* (1960) 363 U.S. 190 [4 L.Ed.2d 1140, 80 S.Ct. 1037]; *Kedroff* v. *St. Nicholas Cathedral* (1952) 344 U.S. 94 [97 L.Ed. 120, 73 S.Ct. 143]; and see California cases discussed and collected in *Metropolitan Baptist Church, supra,* 48 Cal.App.3d at pp. 858-859.)

Plaintiffs' reliance on *Kedroff* or *Kreshik* is therefore misplaced. In those cases, the issue was whether one branch or another of the Eastern Orthodox Church was entitled to use St. Nicholas Cathedral; to decide entitlement, the trier of fact would have been required to decide the "true faith." We deal here with a hospital, not a church, and it is well-established that a religious group may not claim the protection of the First Amendment with respect to its purely secular activities. (E.g., *De La Salle Institute* v. *United States* (N.D. Cal. 1961) 195 F.Supp. 891, 901-902, 903-904 [Christian Brothers Winery case].)

Plaintiffs argue that if the statutory authority conferred on the Attorney General to supervise religious trusts (Corp. Code, §§ 9505, 10207) is to be constitutional, it must be construed to prohibit scrutiny of "religious" activities except where a compelling state interest is involved. Plaintiffs' position is, however resourcefully stated, contrary to the established rule that the application of neutral principles to situations not involving the internal operations of a religious group infringes on no First Amendment rights.

### 2. *The Retirement Plan*

The trial court made the following relevant findings: Plaintiff Franciscan Sisters of the Sacred Heart (Motherhouse) is an unincorporated association and a religious order of the Roman Catholic Church. The property of Queen does not belong to either Motherhouse or the Roman Catholic Church. From the inception of the hospital through 1971, services were provided Queen by Motherhouse and performed by the sisters of Motherhouse. When services were performed, all amounts requested by the Motherhouse for those services were paid by Queen, and except for such compensation, the services were considered donated to Queen by both parties. Neither Motherhouse nor the Sisters expected any further or future compensation for those services.

Although the claim for compensation for past services was made in good faith and was not a dishonest claim, "there was no basis for such

claim and neither Motherhouse nor Queens had a reasonable basis for believing in the validity of the claim." The compromise of the claim—e.g., the retirement plan—"was not a proper exercise of sound business judgment or of the fiduciary duties of Queens' Board."

The court concluded that Queen had no lawful obligation to repay Motherhouse, that the compromise agreement was invalid, that the retirement plan was invalid and that, if implemented, it would constitute a diversion of charitable assets.

First, although plaintiffs make much of the relationship between Queen and Motherhouse and attempt to present this relationship in terms of Roman Catholic canon law, the trial court properly rejected this approach. Plaintiffs' assertion that such evidence is material reflects an attempt to bootstrap a First Amendment argument by citing possibly undisputable evidence concerning the moral and ecclesiastic duties of Queen and Motherhouse, and then arguing that whether the retirement plan accords with church doctrine is an internal ecclesiastic matter. Throughout, plaintiffs have sought the benefits of and conformed to the general requirements of civil law; they cannot now decline to be ruled by the principles which Queen has itself invited. (*De La Salle Institute* v. *United States, supra,* 195 F.Supp. 891, 901.)

■ Applying neutral principles, there is no merit to plaintiffs' contention that the trial court erred in finding the compromise agreement invalid. Plaintiffs concede that a compromise is subject to objection where the invalidity, unenforceability or groundlessness of the claim is known to the parties at the time. (See *Goldstone-Tobias Agency, Inc.* v. *Barbroo Enterprises Productions, Inc.,* 237 Cal.App.2d 720, 722 [47 Cal.Rptr. 347], and cases collected.) There is no evidence in the record—nor do plaintiffs claim there is—to support any conclusion or finding other than that there was no reasonable basis for compromising the $16 million claim submitted by Motherhouse for past services.

Although plaintiffs attempt to analogize the pension plan to a—sometimes—enforceable promise to pay for past services (e.g., *Walsh* v. *Parker,* 24 Cal.App.2d 224, 229-230 [74 P.2d 531], but cf. *Dow* v. *River Farms Co.,* 110 Cal.App.2d 403, 410-411 [243 P.2d 95]), as the Attorney General points out, the compromise "bore no relationship whatsoever to a traditional retirement plan as it provided payments to all of the Sisters

of the Order over the age of 70 wherever situated, regardless of whether they had ever served at Queen of Angels, or if so, how long, or when, and regardless of any other provisions being made for such Sisters through retirement plans at any of the other ten hospitals established by the Franciscan Sisters."

The only evidence concerning the obligation of Queen to pay for past services is that for a number of years Queen did make payments to the Franciscan Sisters in return for services performed by the sisters. Besides, until June 1971 none of the Queen's directors or plaintiffs' accountants had ever heard of a claim.

In brief, the trial court's findings and conclusions are well-supported by the evidence.

Plaintiffs alternatively contend that even if the retirement plan is otherwise invalid, Queen was entitled to make such a disposition of funds under Corporations Code, section 9501, subdivision (g). This subdivision was not enacted until 1974, effective 1975, and thus was not even before the trial court. Nevertheless, plaintiffs contend this court should decide the applicability of section 9501, subdivision (g) on the record before us.

■ Corporations Code, section 9501, subdivision (g) provides in relevant part: A nonprofit corporation can pay "the reasonable value of services rendered in this state to the nonprofit corporation before January 1, 1975, and not previously paid, by any person who performed such services on a full-time basis under the direction of a religious organization in connection with the religious tenets of the organization."

We can leave aside plaintiffs' contention that the correctness of the trial court's decision "must be determined by the law as it is at the time of the decision on appeal, rather than as the law may have been at the time the judgment was rendered." Plaintiffs' further contention that there is "an adequate evidentiary basis in the instant record to bring the case within section 9501(g)" is denied by the Attorney General who claims that numerous factual issues—e.g., the reasonable value of services rendered, whether the person performed on a full-time basis, whether they were not previously paid—must be decided to determine whether the recipients fall within section 9501, subdivision (g). We agree that we cannot make

the necessary determinations on this record; indeed, to some extent, plaintiffs' claim that section 9501, subdivision (g) encompasses the plan is contradicted by the evidence which, for example, shows that payments are made to all of the Sisters in the Order irrespective of whether and for how long they served at Queen of Angels Hospital.

### 3. Fees

■ The Attorney General contends that Queen's agreement to pay 3 percent of the annual rentals for the first five years of the lease and 2 percent of the annual rentals for each year thereafter as fees for negotiating the lease is, in fact, an agreement to pay real estate brokers' fees and, since none of the recipients is licensed, the agreement is invalid.

The trial court found that the lease entered into by Queen "was conceived and accomplished through the joint time, effort and services of Glenn Thomason, John L. Donovan and J. J. Brandlin in finding the lessee, . . . and in bringing together the parties to the transaction. In addition, J. J. Brandlin conducted the negotiations between the parties, prepared the documentation of the lease, and performed the legal services necessary in connection therewith. . . . [¶] . . . J. J. Brandlin was not a licensed real estate broker, but was a lawyer duly licensed to practice in California. His failure to be licensed as a real estate broker does not prevent him from receiving the fee as a finder's fee and for all other services including legal services performed."

The underlying facts are as follows: During the time in which this lease was negotiated, prepared and executed, Brandlin was Queen's attorney and also a member of Queen's board of directors. The hospital was in financial difficulties and Brandlin was authorized to find out what could be done about leasing the hospital, an idea he had proposed informally. Another of Brandlin's clients was John L. Donovan, a stockbroker, through whom Brandlin met Glenn Thomason, "a kind of hospital entrepreneur" who "deals in hospitals." None of the three was licensed as a real estate broker. In late 1969, Brandlin, Donovan and Thomason had contemplated the formation of a corporation—"American Hospital Administrators"—to acquire or lease hospitals and go "public" with them, but the project never got off the ground.

In July 1970, after preliminary discussions, Brandlin was told by Sister Timothy Marie that Queen's was interested in pursuing the possibility of

a lease. Brandlin asked Thomason to wire W.D.C. to see if they would be interested. W.D.C. made a general offer which Brandlin found unsatisfactory and he asked Thomason to get something more definite. W.D.C. made a proposal with some definite terms. In September 1970, Brandlin met with the W.D.C. representative to discuss the terms of the lease. After further discussions with W.D.C. and with the order's headquarters in Illinois, Brandlin began preparing the documents. Brandlin did all of the legal work.

The agreement presented to the board covering the services of Thomason, Donovan and Brandlin states that the three "are entitled to reasonable compensation" for their "services," that such "reasonable compensation . . . shall be commensurate with the commission recommended by the Los Angeles Realty Board for negotiating a long-term lease, to wit, three percent (3%) of the rent for the first five (5) years, and two percent (2%) of the rent thereafter," the compensation to be "payable out of rents, as and when received," to be paid to Thomason and Donovan in specified proportions for the first four years and two months of the term and "the remainder to Brandlin as and when due . . . ."

Brandlin was employed on a retainer basis by Queen until about April 1971, and thereafter he billed his legal services—other than the fee in dispute—based upon an hourly rate.

Business and Professions Code section 10130 provides that no one can act as a real estate broker or salesman without first obtaining a license. Section 10131 defines a real estate broker and section 10132 defines a real estate salesman. Section 10133 then provides: "The definitions of a real estate broker and a real estate salesman . . . do not include the following: [¶] (c) Services rendered by an attorney at law in performing his duties as such attorney at law."

In view of our conclusions on the two main issues and the contingent nature of Brandlin's fee, we deal with the attack on its propriety rather summarily.

That Brandlin's involvement in three capacities—lawyer, trustee and frustrated entrepreneur—was legal and professional dynamite is obvious. Nevertheless, professional protocol—such as disclosure, disqualification as trustee when called for—appears to have been scrupulously observed.

There are minor factual conflicts in the record and we assume that the trial court could have drawn different inferences from the evidence than it did. The point is that it did not.

In essence, this is what happened: Brandlin rendered legal services to Queen. These were undoubtedly of such a nature that a layman would have been required to be a licensed real estate broker. Brandlin, however, was an attorney and, as such, came within the exception of section 10133, subdivision (c). (*Haas* v. *Greenwald,* 196 Cal. 236, 243 [237 P. 38, 59 A.L.R. 1493]; *Provisor* v. *Haas Realty, Inc.,* 256 Cal.App.2d 850, 857-858 [64 Cal.Rptr. 509].)

The Attorney General claims that Queen could not obligate itself to pay Donovan and Thomason anything because they were more than mere finders. (See *Zappas* v. *King Williams Press, Inc.,* 10 Cal.App.3d 768, 772 [89 Cal.Rptr. 307].) To be brief and blunt, we disagree on the facts. ▪ Nor do we find any merit in the contention that Brandlin agreed to split his fee with laymen in violation of former rule 3 of the Rules of Professional Conduct. Apart from other considerations (see *Emmons, Williams, Mires & Leech* v. *State Bar,* 6 Cal.App.3d 565, 571-572 [86 Cal.Rptr. 367]) it does not appear that Brandlin agreed to split his fee. Under the contract he simply was not to receive anything until, after four years and two months, Donovan and Thomason had been paid in full.

The judgment is reversed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied February 23, 1977, and the opinion was modified to read as printed above.