[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
No one now lives in the Jewish Home for Aged of Rhode Island at 99 Hillside Avenue, Providence, Rhode Island. The last resident moved out on October 27, 1993. No one worships on Sabbath Eve in the first floor synagogue. The activity rooms are still. No meals are prepared in the Kosher kitchen. This case involves the question of whether the Court can or should do anything to re-open the Home.
The nursing home formerly operated by the defendant Jewish Home for the Aged of Rhode Island, Inc. will be referred to simply as "the Home." The not-for-profit corporation, itself, will be referred to by its initials as "JHARI."
The plaintiffs seek preliminary relief in equity from the Court to prevent the final abandonment of the Jewish Home and the sale of its physical facilities. One plaintiff, Miss Ruth Zelda Meyer, who had lived at the Home for over four years and still lived there at the time this action was commenced, had been forced against her wishes by the closing of the Home to move to another nursing home at the time of the hearing. Other plaintiffs are identified as past donors of money to JHARI to be used for the benefit of residents of the Home. Another plaintiff is a member of the Jewish community who expresses a strong interest in preserving a place where older and infirm Jewish people, who can no longer maintain themselves, will find their religious, ethnic, social and cultural needs served in community with others in a like situation. The plaintiffs allege that they represent a class and ask that the Court certify this action as a class action under Super. R. Civ. Proc. Rule 23. They also seek the appointment of a temporary receiver to take control of the assets of JHARI, whether or not JHARI is allowed to go through with the proposed sale of the nursing home facility.
The defendants are JHARI, the more than 93 individual members of its board of trustees, including the executive committee of the board, the Attorney-General, in his capacity as common law and statutory administrator of charitable trusts, and the Directors, respectively, of the Departments of Health and of Human Services.
In the course of hearing, the Court issued an interim Order, entered on November 1, 1993, to preserve its jurisdiction over the subject matter of this litigation. In effect this Order was a "stand-still" order. The Department of Health was ordered to leave JHARI's nursing home license in full force and effect pending decision of the plaintiffs' application for preliminary relief. JHARI was ordered not to proceed to consummate a sale contemplated in an October 18, 1993 letter of intent. The Department of Human Services was ordered to continue its medical provider agreements with JHARI in full force and effect.
I.
JHARI's official history began on May 27, 1912 when the Secretary of State certified that a corporation was formed "under the name of The Jewish Home for the Aged by the Ladies Union Aid Association, for the purpose of providing and maintaining a home for the aged and infirm, . . ." The record is silent as to whether the Ladies ever did provide or maintain a home for the aged and infirm, but nearly eighteen years later a corporation known as Jewish Home for the Aged Building Corporation was created on February 24, 1930. The purpose of that corporation was stated in part in its non-business original articles of association to be: ". . . [the] promoting, developing, maintaining and coordinating social welfare and charitable work having to do with the care and maintenance of the aged and with the work now carried on by the Jewish Home for the Aged, Providence, R.I., and to raise through solicitation or otherwise collect, receive, acquire, hold and in any manner dispose of money and real and personal property for such purposes." On June 12, 1930 this corporation acquired what is now Lot 625 on Assessors Plat 91 in the City of Providence, consisting of 105,478 square feet of land between Hillside and Chace Avenues. This corporation changed its name to the one by which it is now known on May 31, 1932. The record is silent but the parties do not dispute that JHARI has ever since and until October 27, 1993 operated and maintained a Jewish Home on the site. On November 20, 1964 JHARI acquired an additional 16,650 square feet of land now identified as Lot 624 on Assessors Plat 91.
On November 21, 1966 JHARI amended its articles of association by declaring its corporate purposes to be the following:
 "The purposes of this corporation shall be to establish, provide and maintain facilities for extended care of aged, and ill men and women, who require protective care, nursing, medical care, and rehabilitation, to promote and carry on medical and scientific research in the care of the aged and infirm, to instruct and train persons in attending and serving the needs and interests of the aged, to work with public and private agencies in the field of geriatrics, and to do any and all other things necessary, or desirable, to carry out the said purposes. The corporation shall be conducted according to traditional Jewish laws and rituals."
There has been no change in the corporate purpose since 1966.
The existing facility consists of two connected and joined buildings. A four story, brick building, constructed in 1953, known as the Annex, provides for 54 patient beds on three floors. The main building is a five story, brick and concrete faced building, constructed in 1977 to replace an earlier building, with a capacity of 200 patient beds on four nursing floors. The Home thus has a total capacity of 254 nursing beds. The buildings are described in great detail at pages 25 thru 32, inclusive, of the Andolfo Appraisal (Defendants' Exhibit V). Because the Home is a health care facility as defined by G.L. 1956 (1989Reenactment) § 23-17-2(1), as amended, a license from the Department of Health is required for its operation according to§ 23-17-4.
There seems to be no dispute that the Home operated at or near capacity, with a waiting list, for many years. In May 1989 a strategic planning committee was convened by the president of JHARI for the purpose of setting a future direction for the Home. Of especial interest in the January 1991 report of that committee (Defendants' Exhibit K) was the report of a demographics task force chaired by Stanley Aronson, M.D.
 "After examining 40 years of death certificates of Jews who died in RI and similar demographic data, the group came to the conclusion that if every Jewish person currently in a nursing home were to transfer to the Jewish Home, over 500 beds would be needed. However, as Table 2, page 19A demonstrates, 47% of the Jewish population admitted to nursing homes are not choosing the Jewish Home. A demographic analysis of those going to the Jewish Home as differentiated from those going to other RI nursing homes was quite revealing. It showed that female, foreign born, lower socio-economic, non-professional people tended to come to the Jewish Home while American born, male, more educated and more affluent residents selected other secular homes. The implications are significant in terms of what the Home must do to ensure having sufficient applications to keep the beds full. In light of the lack of a waiting list at the Home for several years, this problem is a severe one that must be addressed. A number of hypothesis were offered for this trend: (1) some people would like more anonymity than is available in coming to the Jewish Home: (2) the Jewish Home is perceived as a Medicaid facility for the poor: (3) the Jewish Home's reputation for quality care has decreased: and (4) the facility has institutional ambiance and is not appealing. With the changing demographic composition of the Jewish Community, this problem will become even more severe unless addressed.
 It was determined that if the Home could address these issues, it could then attract more of the Jewish population that are currently going elsewhere and therefore our future census is in our own hands in terms of making the Home both functional and attractive. However, this will only happen if we are able to take the steps needed to position the Home to attract more of the Jewish elderly to the Home. Failure to do so would result in the Home having a bed surplus in the future."
Dr. Aronson's gloomy prognosis was to prove to be devastatingly accurate by the time he took the chair of the board of trustees in June 1993.
The 1991 strategic plan embodied twenty-two numbered recommendations. The religious orientation of the Home was to be preserved. The population was to be downsized. The overall mission was to be expanded from that of merely providing residential nursing care to becoming a full-service geriatric center. During the Summer of 1992 JHARI was planning to re-construct its service facilities along the lines proposed in the strategic plan of 1991. Architects and engineers were consulted to formulate a design for a more realistic facility in terms of size. The executive committee was considering proposals to re-construct the existing facility or to build a new structure. Events soon overtook the strategic plan, and so these proposals were scrapped when survival became critical.
By the end of 1992 the waiting list was non-existent. Any more than 3 or 4 vacancies in any month would produce a deficit. In the Summer of 1992 an outbreak of scabies among staff and residents had caused unfavorable publicity for the Home. It became difficult to attract new residents. The June 30, 1992 financial statement (Plaintiffs' Exhibit 2), which was available to the Board after September 25, 1992, revealed that expenses exceeded revenues by $270,000. The statement, however, does not accurately reflect the deficit arising out of operations, because revenues included $1,343,000 of receipts from sources other than payments for patient care, and expenses included a non-cash accounting charge for depreciation in the amount of $296,000. By the end of 1992 losses were running between $60,000 and $70,000 per month. The Home was sustaining a diminished ability to deliver quality care.
The organization of JHARI is established in its by-laws (Plaintiffs' Exhibit 8). Anyone who pays annual dues is a member of the corporation. The members elect certain corporate officers and thirty-one trustees at each annual meeting. The trustees consist of the ninety-three members of the corporation elected by the membership at annual meetings, seven members appointed by the chair, all honorary corporate officers and trustees and three members appointed by the Women's Association. The trustees meet regularly only three times annually between annual meetings of the corporation. Special meetings of the trustees are authorized. The trustees are authorized by an appropriate vote to exercise fundamental corporate powers including the sale of any real property of the corporation or the disposition of all or substantially all of the property and assets of the corporation. The trustees are empowered to dissolve the corporation and distribute all or substantially all of the property and assets of the corporation. Finally, the trustees approve the annual operating and capital budgets of the corporation. More direct control and management of the affairs of the corporation is vested in the executive committee. That committee is authorized to exercise all corporate powers not otherwise exclusively vested in the trustees or members. The executive committee consists of three chairpersons of certain corporate committees, the chairperson and vice-chairperson of the board of trustees, the treasurer and legal counsel to the corporation, the president or a designated delegate of the Women's Association and the immediate past chairperson of the board of trustees. This committee meets at the call of the chairperson of the board of trustees who chairs the committee. One of the standing committees, whose chairperson is a member of the executive committee, is the finance committee. That committee recommends proposed budgets to the executive committee for approval. It is also required to review monthly all expenditures for compliance with the budget. For that purpose, as well as others, it is required to meet at least ten times annually and to report in writing to the executive committee.
The day-to-day operation of the Home as a licensed nursing home is vested in a president who is appointed by the executive committee and subject to its direction at all times. The president is the chief executive officer of the corporation. Provision is also made for a vice president who is appointed by the president with the approval of the executive committee and who is designated chief operating officer of the corporation. The president serves as a member without vote on all corporate committees and is charged with providing each committee with all the information it needs to function productively.
With this corporate structure JHARI was called upon to deal with the impending crisis of the Winter of 1992-1993 and Spring of 1993. The first warning signal in the record of this hearing appears in the minutes of an executive committee meeting on November 24, 1992. According to the minutes of that meeting the president reported that due to seventeen vacancies the Home faced significant losses. He hoped to address these vacancies by putting out publicity favorable to the home. At the same time the Home was confronting significant administrative and staff cuts. The committee planned to meet with the union to discuss give-backs from union employees. The finance committee chairperson expressed concern about the size of the loss and the need for some quick action. The president warned that cutting costs would affect the quality of service. According to the testimony of Dr. Stanley Aronson, then a member attending that meeting, the cumulative loss was approximately $570,000.
As 1992 drew to a close the Home planned to close the third floor of the annex, reducing its capacity by eighteen beds, but without any concomitant reduction in costs. In addition, non-union employees were taking furloughs which were the equivalent of pay cuts. The president reported, however, that when he approached the union for help in reducing the deficit he was rebuffed because of what union representatives regarded as a "top-heavy" management, which the union declined to subsidize. A source of immediate controversy were five "nurse managers", which the union contended were unnecessary unless their positions were included in the bargaining unit. By the end of January 1993 one floor of the annex was closed and decertified. The executive committee was struggling with concepts of downsizing the Home, none of which appeared to be effective in eliminating the deficit except those which depended on union give-backs. According to the financial report of January 31, 1992 (included in Plaintiffs' Exhibit 16) the Home had accumulated a deficit of $445,518.
Representatives of JHARI and representatives of Local 1199 of New England Health Care Employees met again early in 1993. Needless to say, each side of these discussions has a different view of what the other proposed or conceded. According to Mr. Stan Israel, the union's bargaining representative, he met with the Home's president and its counsel sometime in the Fall of 1992. The Home asked at first for concessions amounting to $250,000, to which the union could not accede without some concessions from management. He was particularly concerned, as confirmed by the president's report, with the five non-union nurse managers. Mr. Israel testified that negotiations resumed in the Spring of 1993. At that time he was advised by management that without significant concessions from the union the Home would have to close. He testified that the union eventually put concessions worth approximately $250,000 "on the table." Mr. Mel Alperin, who represented JHARI during these discussions, testified that the union concessions never amounted to much more than $100,000. By the time of that proffer the Home's deficit exceeded $1,000,000. Mr. Israel says that by the time the Home announced its closing the union was being asked to accede to concessions amounting to $450,000. In his testimony Dr. Aronson said that JHARI was asking the union to cutback one-half of the contributions to the employees' pension plan together with other reductions of $300,000 to $400,000.
While all this was going on, the board of trustees met on March 2, 1993. The chairperson of the financial committee reported that the Home was looking at a loss of $350,000 for the year ending June 30, related to a drop in census. The chairperson of the board reported significant financial problems facing the Home and disclosed that they were turning to the union for "give-backs to help us make it fiscally." Nothing appears from the record that the trustees were informed by the executive committee of the true dimensions of the coming crisis, if the committee was itself then fully aware of its dimensions.
On March 23, 1993 Dr. Aronson reported to the executive committee that, "The future of the Home will probably be decided within the next 3 months." Looming on the horizon at that time were threatened reductions in medicaid reimbursement, which would entail serious impact on the Home because of its medicaid patient load in excess of the State average. From all the evidence, it is clear that through the first months of 1993 the executive committee of JHARI was struggling with a two-pronged approach to controlling its growing deficit. First, it was considering re-structuring the operation of the Home, itself. At the same time it was reducing administrative and managerial overhead. Second, it was trying to reduce its labor related costs through contract re-negotiation with the representatives of its unionized employees.
By May 31, 1993 JHARI confronted a deficit of $599,451, according to its monthly financial statement. In June 1993 Dr. Aronson succeeded to the chair of the board of trustees. The executive committee agreed to a deadline of June 15 for union concessions. On June 4 a meeting of the board of trustees was called for June 15.
The executive committee met at 8:00 a.m. on Tuesday, June 15, 1993. Mr. Mel Alperin, then part of the Home's negotiating team, advised the committee that the union had declined to meet the Home's needs for give-backs. After what the minutes described as "hours of anguished discussion," the committee unanimously resolved that:
 "The executive committee of the board of trustees of the Jewish Home unanimously recommend to the board of trustees that should the Home's president be unsuccessful in convincing the union to agree to concessions in the amount deemed necessary to the Home's fiscal integrity by 12:00 noon on Friday, June 18, 1993, that the board authorize the executive committee and the president to take any and all steps necessary to properly close the home."
The board of trustees met at 7:30 p.m. on June 15, 1993. The finance committee reported that losses were running at $60,000 to $70,000 per month. The negotiations with the union were explained by Mr. Alperin, who pointed out that the union had agreed to give-backs amounting to $200,000, while the Home needed much more. Members of the executive committee explained that no alternative to closing the Home was available, because downsizing would not work and management cuts alone will not be sufficient for fiscal stability. Finally, a motion to authorize "the executive board (committee) and the president to take any and all steps necessary to properly close the Home if the union does not make concessions deemed necessary," was carried by the 69 trustees present, with one vote against and one abstaining. Dr. Aronson: "This is the saddest day of my life."
On June 18, the union's response being deemed inadequate, the executive committee unanimously voted to proceed with the orderly closing of the Home. A plan for a closing procedure was approved. A press conference was scheduled for June 21, 1993 at 10:00 a.m. The State Department of Health was notified of the closure by telephone on June 18 and received the closure plan on June 20, 1993. That plan was approved by the Department of Health on June 21, 1993 according to a letter dated August 15, 1993. The original date for final closure was September 15, 1993, but subsequent events required that date to be extended to October 31, 1993. Mediation under State auspices on June 23, 1993 was unsuccessful in resolving the differences between the Home and its employees' union.
Soon after the announcement of the closing of the Home, the transfer of resident patients to other facilities began. During July it became apparent that providing Kosher food for transferred patients would be a continuing problem. Also, during July, Dr. Aronson introduced the concept which became Jewish Eldercare of Rhode Island (JERI). The objective of JERI was to establish and carry out a program of specialized care for Jewish elderly with particular attention to residents transferred out of the Home. JERI was to provide pastoral comfort to elderly Jews in secular nursing homes; to insure that Kosher dietary needs of these residents were addressed; to offer them religious services, mezuzot (encased ritual door-post scrolls), prayer books and holiday meals; and to maintain close ties with other Jewish agencies in the community. Eventually JERI was established and was funded by the Jewish Federation of Rhode Island using funds which had been allocated to JHARI to operate the Home.
Ms. Penny Faich became JERI's full-time coordinator on August 25. She had been the director of recreational therapy at the Home for five years before the closure. Her principal activities at the time of the hearing was to maintain contact with the Jewish elderly dispersed among 59 non-Jewish nursing homes, who she testified included over one hundred residents who had not been transferred from the Home. Assisted by four other employees she provides distinctive Jewish cultural recreational programming at some of the nursing homes with Jewish residents. According to her testimony she, or her fellow employees of JERI, had seen all but four of the 126 former Jewish residents of the Home who were transferred to nursing homes in Rhode Island. She testified that on the whole transferred residents were "faring better than I hoped." Some residents, she said, actually preferred not to return to the Home.
She had compiled an analysis of where former residents of the Home had been transferred (Defendants' Exhibit I). Thirty-nine transferred residents were not Jewish. One hundred twenty-six Jewish residents were placed in fifty-nine non-Jewish nursing homes in the State, with the greatest number, twenty-three, going to Rosewood Health Center on the east side of Providence. As of the time of her compilation, 8 Jewish residents remained in the Home, and no other nursing home had taken more than 6 Jewish residents from the Home. On cross-examination, Ms. Faich acknowledged that there were no synagogues or prayer books at any of the nursing homes. She further conceded that the matter of Kosher food remained a "volatile" issue.
During August 1993, JHARI tried unsuccessfully to establish a Kosher wing at one of the secular nursing homes. By the end of the month less than 30 residents remained in the Home, of whom about half required Kosher food. The executive committee decided to arrange with the Hebrew Day School's Kosher kitchen to provide food for Jewish residents at Rosewood Health Center. At a meeting on August 5, 1993 the trustees approved a resolution permitting the endowment fund of the corporation to be used for "the payment of obligations incurred by the Corporation in connection with the general operational expenses and capital expenses of the Corporation and the winding up and closing expenses of the corporation." Also, on that date the trustees resolved that all monies received from the sale of assets or otherwise which may be in excess of those funds needed to satisfy its liabilities would be paid into the endowment fund. The executive committee decided to defer obtaining a formal appraisal of the real estate, fixtures and personal property of the Home until it received proposals to purchase the facility. The committee also agreed to give Temple Shalom all of the equipment of the synagogue, including pews, windows, memorials and Torah scrolls. The Temple had agreed to maintain the yahrzeit (annual death memorials) program.
On September 15 Health Management Services took over physical operation of the Home. Twenty-one residents remained at the Home. By September 27 the executive committee was made aware of an ad hoc group in the community trying to find a way to keep the Home open. A proposal had been made by a Mr. Friedman who ran a number of Kosher nursing homes in or around New York City. A prospective bidder was concerned that if the Home's census fell to zero its license would be pulled by the State. The committee agreed to speed up the process so that an initial letter could be executed so an application for a transfer of the license could be filed while the license was still in effect.
II.
On September 28, 1993 the plaintiffs commenced this action against JHARI, the executive committee, the "General Board of the Jewish Home", and the Attorney-General. An application for a temporary restraining order to prevent JHARI from closing the Home or relocating any more of the Home's residents or doing anything else which might cause it to lose its license as a nursing home was denied on September 29, 1993. Hearing on preliminary injunction was set for October 12, 1993. On that date the plaintiffs filed an amended complaint adding the Directors of the Departments of Health and Human Services, respectively. They also added a prayer seeking to restrain and enjoin those State departments from revoking the Home's licenses and eligibility for Medicare and Medicaid reimbursements. A temporary restraining order was refused by the Court on October 21, 1993, but the matter was set for hearing on October 26, 1993 on preliminary injunction and the appointment of a receiver.
In the meantime, on October 5, 1993, Mr. Jack Friedman, wrote a proposal on the letterhead of Franklin Nursing Home in Flushing, New York to the Home, which was a follow-up to a proposal he had made on August 31, 1993 to the president of the Home. He wrote that he was prepared to keep the Home open and immediately to re-admit any of the patients who wished to return to the Home and aggressively to seek to bring the Home back to an "acceptable" occupancy level. He said he would require that the endowment funds be left in place and their income available, presumably to him for the costs of operation. He would also require an unspecified amount of working capital to defray start-up costs, which he suggested would be a "loan" (his quotation marks) from the endowment fund. Finally, he specified that the Home's collective bargaining agreement with Local 1199 be re-negotiated. He did not suggest who would negotiate on behalf of the Home, nor did he indicate he had knowledge of the failure of any recent efforts at re-negotiation. Mr. Friedman concluded by indicating he was prepared to cover the first $150,000 of losses, without specifying how or when such "losses" were to be computed. Purchasing the Home was out of the question at that time for Mr. Friedman. The executive committee voted on October 12 to reject his overture to manage but not to purchase the Home. At that same meeting the committee learned that the properties committee had received a proposal from Consultants, Inc., which was worth following up with negotiations. The properties committee was authorized to pursue negotiations with Consultants, Inc. and to enter into a letter of intent. Although Mr. Friedman had requested an opportunity to make a presentation to the committee at this meeting, he was not invited and did not appear.
On October 18, 1993 JHARI executed a letter of intent, through the chairman of its board of trustees, to sell the land and buildings, fixtures and tangible personal property used in connection with the operation of the Home to Consultants, Incorporated, or its assigns. On October 22, 1993, Hillside Health Center Associates, L.P., a limited partnership in which Consultants, Inc. is the sole general partner and Antonio L. Giordano is the sole limited partner, applied to Rhode Island Department of Health for its approval of a change in ownership of the Home.
Although Mr. Jack Friedman, himself, never testified at the hearing, Mr. Nachum Sherman, a certified public account, who was responsible in various official capacities for financial matters at the nursing homes managed by Mr. Friedman in the State of New York, did testify by deposition and in person. He testified that he received the package distributed by the properties committee to solicit proposals of interest in purchasing the Home. He made a physical inspection of the Home sometime late in September as he remembered it. Also, he was furnished a copy of the collective bargaining agreement, the Home's latest survey reports and its medicaid rate sheet. He also came into possession of the June 30, 1992 financial statement. When asked for his expert opinion as to the economic condition of the Home, he testified that there was "some major mismanagement on the part of the management team that was there." He felt that the fringe benefits for employees was excessive relative to the Rhode Island nursing home average. An expense of $75,000 for child care services was unnecessary, as were the positions of director of personnel, director of volunteers and an assistant (executive) director. In his opinion he believed that labor costs could have been reduced about $800,000 to $900,000 if the Home "had a contract that was on par with union contracts in other nursing homes in Rhode Island . . . coupled with eliminating certain positions." He testified that, although a Jewish nursing home is different from other nursing homes in respect to Kosher food, religious services and cultural services, it is no different from other nursing homes in respect to financial matters. It was his opinion that the Home "could be run effectively and be productive." Even as of the date of his deposition, October 21, he believed the Home could be salvaged. It would take approximately one year to get the Home to a break-even level. He estimated re-start costs to be approximately $500,000, paid out over a seven to ten month period. On cross-examination he acknowledged that it would take between $300,000 to $600,000 to revamp the Home physically to re-open. He made quite clear that Mr. Friedman had no intention of investing or risking any of his own money. During his personal testimony, Mr. Sherman did not deviate from any of the material evidence provided in his deposition. He did offer evidence that Mr. Friedman was a successful operator of Kosher nursing homes in three different locations in and around New York City.
In the course of his testimony, Mr. Israel testified that he was of the opinion that the Home had excessive management expenses. He criticized the five nurse managers and a vice-president of nursing. He pointed to the vice-president of operations, a vice-president of human resources, a vice-president for public relations, a director of volunteers and a full-time controller. It was his observation that the functions of some of those positions could be combined with other positions as they were in some other Rhode Island nursing homes.
Mr. Larry Parness, a former trustee of JHARI, a self-employed certified public accountant, with some experience reviewing the finances of health care facilities, testified for the plaintiffs. He testified that employee fringe benefits at the Home were 40% of payroll during 1990 and 1991 while the average in Rhode Island was between 25% and 28%. Since the Home's payroll was approximately $6 million, he felt that if fringes could be reduced 12% to the State average, labor costs could be reduced by $600,000. He also felt that dietary costs could be reduced by more than $275,000 and administration by $250,000. He gave no opinion as to how these savings could be achieved nor did he attribute any costs in excess of the State average to mismanagement.
Mr. Sherwin Z. Goodblatt, a person of considerable experience in the management of and consultation with health care facilities, including nursing homes, also testified as an expert witness for the plaintiffs. He examined JHARI's June 30, 1992 financial statement and certain of the Home's payroll documents. It was his opinion that management had allowed the Home to operate "on a downhill course without stemming its losses." He, too, pointed to a "heavy" fringe benefit package. He felt that senior management could be reduced by eliminating or consolidating top-level departments. He saw no need for nurse managers, when the Home had charge nurses on each floor. He testified that the Home could accumulate cost savings from the reduction of fringe benefits and elimination of middle management positions. He also suggested that there were revenue enhancement techniques that could be explored through specialized accounting firms. His ultimate opinion, like that of Mr. Sherman, was that the Home could be operated in the black and, if re-opened, would take one year to reach 75% to 80% occupancy.
The defendant presented economic evidence from two expert witnesses. Mr. Richard J. DeRienzo, a certified public accountant with manifest and uncontested credentials in financial matters involving the constructing, acquiring, selling and expanding nursing facilities, as well as preparation of operating budgets, development of reimbursement strategies and systems and negotiation with financial institutions and state agencies on behalf of nursing care facilities, testified for the defendants. His testimony involved the presentation of cost data assembled for Rhode Island Association of Facilities for the Aged (RIAFA), the Rhode Island trade association of not-for-profit nursing homes, and published as "RIAFA 1992 Cost Survey" (Defendants' Exhibit S). Of significant interest to Court is the table at page 9 which presents the 1992 ranking of each of the 19 not-for-profit nursing homes in Rhode Island. The Home ranked fourth highest in labor and payroll related costs on a patient day basis and fourteenth in occupancy rate. Also of significance is the fact that the average cost per day of the non-profit homes exceeded that of for-profit homes by $28.47 per patient and the total industry average by $20.88. It just plain cost more to run a non-profit than a for-profit home per patient day on average during 1992. Among non-profit homes on average it cost more to run a urban than a non-urban home, although it did cost less on average per patient day to operate a union home than a non-union one, which may be accounted for by the fact that the average per day cost was less for homes with 120 or more beds than those with less. In addition, only two such non-profit homes were unionized in 1992.
Mr. Steven M. Garfinkle, a certified public accountant, with strong experience in nursing home finances and accounting, who has performed accounting services for JHARI since 1980, testified for the defendants. He prepared both the certified financial statement of June 30, 1992 and the unaudited financial report as of June 30, 1993 (Plaintiffs' Exhibit 17). This document was not prepared in accordance with generally accepted accounting principles, because a liquidation basis for accounting was not used. In addition, management elected to omit substantially all of the disclosures required by generally accepted accounting principles. So that, for example, it is not clear what were the sources of $1,364,000 of other revenue in the statement of revenues and expenses of the general fund. Since the accounts are unaudited, it is impossible to determine the basis of estimated liabilities. Despite these infirmities, this report reflects the best available current data regarding the position of JHARI's finances by the end of its last fiscal year. Expenses exceeded revenues by $772,000. While not very encouraging, that accounting figure is not so graphic as the June 30 monthly statement which shows a cumulative year-to-date cash-flow deficit of $523,002.00. He testified that it was part of his service to advise management through the finance committee of any waste or mismanagement. He was satisfied that the Home was reimbursed by third-party payers to the maximum extent. It was his opinion that labor costs were not excessive or out-of-line.
This case involves more than JHARI's financial condition just before and during June 1993. Rabbi Eliezer Y. Gibber, Dean of the New England Rabbinical College, testified that it was a well-established religious obligation and traditional responsibility for Jewish people to provide necessaries for people who are unable to care for themselves, including the aged members of the community. He testified that it was both an individual as well as a community obligation. On cross-examination he acknowledged that there was no obligation to discharge that responsibility at any particular facility.
The most poignant and moving testimony came from Mr. Aaron Wold, who, upon reaching emeritus faculty status at Brown University in 1992, took up the obligation of visiting sick and elderly members of the community in the Home and elsewhere. He described the emotional torment suffered by residents of the Home in June when the closing was announced and the psychological impact on the residents of the transfers from the Jewish atmosphere of the Home to unfamiliar destinations. He had called on one of the attorneys for the plaintiffs to see if the closing could be avoided. Rarely has such moving testimony been presented to this Court. His testimony was corroborated by the deposition evidence of the plaintiff, Miss Ruth Meyer, of Mrs. Rhonda Gerber and of Mrs. Norma Dawson, a nurse at the Home at the time of the closing.
III.
The linchpin upon which the granting of preliminary equitable relief hinges is the likelihood that the plaintiffs will succeed on the merits of their claim for permanent equitable relief.Leone v. Town of New Shoreham, 534 A.2d 871, 873 (R.I. 1987). Where the relief sought is injunctive the plaintiffs must show that unless an order is issued before a hearing on the merits they will suffer irreparable harm, and that their harm will outweigh any harm to the defendants which ensues from issuing a temporary order. Id. In addition, where a defendant is a governmental agency, plaintiffs must show that the public interest will be served by granting temporary relief. Because the parties usually present nearly all the available evidence and pertinent legal arguments on the merits of the issues presented by the claims for injunctive relief on an application for a preliminary injunction in order to satisfy or defeat the showing of a likelihood of success on the merits, Rule 65(a) of theSuperior Court Rules of Civil Procedure permits the Court to advance and consolidate the hearing on the merits of the claim for a permanent injunction with the hearing on the application for a preliminary injunction. The plaintiffs have asked the Court to advance and consolidate the merits at this hearing. The defendants object.
The plaintiffs also seek the appointment of a receiver underG.L. 1956 (1992 Reenactment) § 7-1.1-97.1, which authorizes the Court to appoint a receiver, even if liquidation of the corporate assets is not appropriate, where grounds for such liquidation are present. They contend that such grounds include those set out in§ 7-1.1-90(a)(1)(D): "The corporate assets are being misapplied or are in danger of being wasted or lost; . . ." Cf. GreaterFort Worth v. Mims, 574 S.W.2d 870 (Civ. App. Tex. 1978) (Court has equity jurisdiction to appoint receiver of non-profit corporation where agency attempts to act in violation of its by-laws).
Consideration of the likelihood of the plaintiffs' success on the merits of their claims for permanent relief is dispositive of their claims for the temporary relief they now seek. If JHARI is not required to continue to operate the Home in its present location, the plaintiffs are not entitled to the injunctive relief they seek. JHARI may then proceed with the sale of the Home. The Department of Health may go on to consider the application to transfer ownership of the Home and its license. JHARI may eventually be required to operate and maintain some kind of facility, which may or may not be like the Home, in which case the plaintiffs will not necessarily be entitled to relief they currently seek in this action, but JHARI's future course may be subject to further litigation.
It is beyond dispute that JHARI is a non-profit corporation organized for charitable purposes. According to its charter and consistent with its long-standing practice, its primary purpose has always been to operate and maintain a residential facility for elderly and infirm Jews in Providence, Rhode Island. Others, including non-Jews, who could benefit from care provided by that facility were admitted as space permitted. Although the charter permitted other purposes for JHARI they have always been regarded as subsidiary to its principal purpose.
JHARI's principal assets consist of the land and buildings which make up the Home, some adjoining land and buildings, together with some invested funds referred to as the restricted endowment. Those assets are held in a form of trust by JHARI to carry out its charitable purposes. See, Metropolitan BaptistChurch of Richmond, Inc. v. Younger, 48 Cal.App.3d 850, 856-57, 121 Cal.Rptr. 899, 903 (1st Dist. 1975).
The closing and sale of the Home completely and immediately prevents JHARI from carrying out its principal charitable purpose. That decision was made by its governing body, the executive committee, with the approval of its board of trustees. Under its by-laws, those bodies clearly had full corporate power to make those decisions. In that sense none of them were engaged in actions beyond their authority under law. Since the trustees have the legal power to terminate JHARI's existence, they plainly have the power to authorize it to cease operating a particular facility.
The plaintiffs rely heavily on the opinion of the California Court of Appeal in Queen of Angels Hospital v. Younger, 66 Cal.App.3d 359, 136 Cal.Rptr. 36 (2nd Dist. 1977). In that case a non-profit hospital corporation organized in Los Angeles by a Roman Catholic religious order leased its hospital premises to a third-party. The religious group proposed to use the proceeds of the lease in part to operate free medical clinics in poor neighborhoods. It was agreed that these clinics were not functionally equivalent to hospitals. The corporation also agreed to use part of the proceeds to fund pensions for aged members of the order. The action was one for declaratory relief brought against the State Attorney-General. The Court held that the corporation was bound by its charter to operate a hospital. It could not, consistent with the trust imposed upon it, abandon the hospital business in favor of clinics.
The plaintiffs' reliance on Queen of Angels Hospital,supra, is misplaced for two reasons. First, in that case no action had been brought to enjoin or prevent the lease of the hospital facilities. The issue of the propriety of the lease, unlike the closing and sale in this case, was not before the Court. Second, the question before the Court in that case was the propriety of the diversion of the proceeds of that lease to the operation of medical clinics and funding of pensions. The Court said: "Queen may maintain a hospital and retain control over its assets or it may abandon the operation of a hospital and lose those assets to the successor distributees, but it cannot do both." (Footnote omitted) Id., 66 Cal.App.3d, at 368-69; 136 Cal.Rptr., at 41. In this case JHARI has not finally decided to go out of the nursing home business forever, and has not reached any decision with regard to a disposition of the proceeds of sale.
The plaintiffs argue that the decision to close and sell the Home was the result of mismanagement or breach of trust by the executive committee. Accordingly, they argue, the beneficiaries of the trust are entitled to some form of equitable relief.
First, they contend that with proper management the Home could have been operated economically. They contend that, even if the executive committee was not mistaken about the dimensions of the crisis they confronted in June 1993, it was the result of their own mismanagement. The defendants, on the other hand, argue that the crisis was due to circumstances beyond their control. It is clear from the evidence that the witnesses for the plaintiff, who testified that the cost of excessive fringe benefits was an area in which the deficit could be brought under control, were unaware that it was precisely that subject which was the source of the fatal impasse with the union. They seemed also to be unaware that administrative and management costs were already the subject of cuts before June 1993 but were causing a dangerous decrease in the Home's quality of care.
In assessing the conduct of the executive committee, the Court is guided by the learned opinion of Judge Gesell of the U.S. District Court for the District of Columbia in Stern v.Lucy Webb Hayes National Training School for Deaconesses andMissionaries, 381 F. Supp. 1003 (D.C. 1974):
 "Basically, the trustees are charged with mismanagement, non-management and self-dealing. The applicable law is unsettled. The charitable corporation is a relatively new legal entity which does not fit neatly into the established common law categories of corporation and trust. As the discussion below indicates, however, the modern trend is to apply corporate rather than trust principles in determining the liability of the directors of charitable corporations, because their functions are virtually indistinguishable from those of their `pure' corporate counterparts.
 Both trustees and corporate directors are liable for losses occasioned by their negligent mismanagement of investments. However, the degree of care required appears to differ in many jurisdictions. A trustee is uniformly held to a high standard of care and will be held liable for simple negligence, while a director must often have committed `gross negligence' or otherwise be guilty of more than mere mistakes of judgment.
 This distinction may amount to little more than a recognition of the fact that corporate directors have many areas of responsibility, while the traditional trustee is often charged only with the management of the trust funds and can therefore be expected to devote more time and expertise to that task. Since the board members of most large charitable corporations fall within the corporate rather than the trust model, being charged with the operation of ongoing businesses, it has been said that they should only be held to the less stringent corporate standard of care. (Citations omitted). More specifically, directors of charitable corporations are required to exercise ordinary and reasonable care in the performance of their duties, exhibiting honesty and good faith." (Citation omitted). 381 F. Supp., at 1013.
This Court is satisfied that the executive committee acted reasonably as it attempted to meet the increasing operational deficits from late 1992 until June 1993. It became increasingly clear that without substantial contribution from unionized employees the Home would quickly become insolvent. The union cannot be faulted for its reluctance to forfeit hard-won bargaining concessions for its generally low-paid workers. The executive committee cannot be held to have mismanaged the Home on the basis of post hoc economic projections, however well-founded, which depend on unattainable union concessions as to fringe benefits.
Next, the plaintiffs contend that, even if mismanagement of the defendant was not the cause of the Home's financial collapse leading up to the decision of June 18, 1993 to close the Home, that decision was an improper exercise of corporate power or a breach of the defendants' obligation as charitable trustees.
The plaintiffs challenge the decision on June 18, 1993 by the executive committee with the approval of the trustees to close the Home. As JHARI is organized, its "trustees" are more realistically analogous to the shareholders of a business corporation and the members of the executive committee to directors. The executive committee was confronted with an emergent fiscal crisis. Without the cooperation of the union they could reasonably see no way to avert financial collapse. The plaintiffs do not suggest any fiscally responsible alternative. JHARI could not blindly exhaust its endowment fund and become insolvent. The executive committee had considered more than one downsizing option, and none of them appeared to offer any hope of stability. Non-union employees had already accepted substantial salary reductions. Wherever the blame lay, by June 18, 1993 the committee reasonably believed it had no option. This Court cannot upset that decision. As the Supreme Court of Delaware said inOberley v. Kirby, 592 A.2d 445 (Del. 1991):
 "A court cannot second-guess the wisdom of facially valid decisions made by charitable fiduciaries, any more than it can question the business judgment of the directors of a for-profit corporation. However, because the Foundation was created for a limited charitable purpose rather than a generalized business purpose, those who control it have a special duty to advance its charitable goals and protect its assets. Any action that poses a palpable and identifiable threat to those goals, or that jeopardizes its assets would be contrary to the Certificate and hence ultra vires." Id., at 462.
Likewise, this Court will not second-guess the defendants in this case as to the economic wisdom of closing the Home.
What happened in this case was that the two duties the law imposes on the trustees and the members of the executive committee came into conflict. They found they could not both
"advance (JHARI's) charitable goals and protect its assets." They chose to sacrifice the charitable goals to preserve whatever would remain of the corporate assets.
JHARI is now very much in an analogous position to that ofQueen of Angels Hospital in Los Angeles. It must "establish, provide and maintain facilities for extended care of aged and ill men and women, who require protective care, nursing, medical care and rehabilitation," in a word or two: a nursing home, or it must liquidate and distribute its assets in accordance with the law. The defendants have currently chosen the liquidation course.
The plaintiffs have produced no evidence that the proposed sale of the Home is improper in any way other than that it puts an end to JHARI's current charitable goals. They do not suggest waste, fraud, conflict of interest, or any bad faith whatever on the part of any individual involved in the proposed transaction. It appears clearly from the evidence and the Andolfo appraisal that the proposed sale represents the currently most feasible means of liquidating the Home. The plaintiffs have urged the Court to order the defendants to consider a purchase proposal submitted by Jack Friedman, who proposes to operate a Kosher nursing home in the former Home facility. They point out that such a sale will permit JHARI to continue to serve both its purposes: to preserve a nursing home within the Jewish tradition and to preserve its assets. JHARI argues that such a course would violate the agreement it has reached with Consultants, Inc. and could well jeopardize the pending sale. It also presents the prospect of losing both the current economic value of the Home as well as the opportunity to carry out any charitable goal in the future if the Friedman proposal turns out to be illusory. In any event, such micro-management of the affairs of JHARI is beyond the capacity of the Court.
The Court agrees with the position of the Attorney-General, as the statutory and common law guardian of charitable trusts, that any preliminary injunction respecting JHARI's distribution of its liquidated assets is premature. In the light of his request that he remain a party to continuing litigation to consider JHARI's future plans, this action should continue. Also, since the plaintiffs and the Attorney-General share a common interest in seeing that the charitable purpose of JHARI's assets be carried out and because it does not appear that JHARI is guilty of waste or other impropriety in its self-liquidation, no receiver is necessary.
IV.
Based on the foregoing findings and conclusions, because it is unlikely that the plaintiffs will obtain permanent injunctive relief, their prayers for a preliminary injunction are denied and dismissed. Because there is no present threat of improper dissipation or misapplication of the assets of JHARI during its self-liquidation, and because it is apparently solvent, no temporary receiver needs to be appointed and the prayers for such an appointment are denied and dismissed.
Although JHARI and its controlling agents have not reached any final decision as to the application or disposition of the assets held by it in charitable trust, there remains a need for continuing oversight by the Attorney-General, in his role as administrator of charitable trusts. In order to afford the plaintiffs and the Attorney-General easy access to the Court, it will retain jurisdiction over this proceeding.
There are no grounds for any relief against the Director of the Department of Human Services and a final judgment dismissing this action under Rules 12(b)(6) and 41(b)(2) may enter on that defendant's behalf.
The public interest in maintaining regulatory control by the Director of the Department of Health over nursing home licenses as a matter of law outweighs any interest by these plaintiffs in having a particular cultural ambience or religious service in a nursing home. See Providence Hospital of Everett v. Departmentof Social and Health Services, 112 Wn.2d 353, 362, 770 P.2d 1040, 1045 (1989). Accordingly, a final judgment under Rules12(b)(6) and 41(b)(2) will be entered dismissing the plaintiffs' claims against the director of the Department of Health.
The interim orders entered on November 1, 1993 are vacated.
The Home stays closed.
The defendants will present appropriate orders and judgments for entry upon notice to the plaintiffs.