[Civ. No. 12114. Third Dist. Apr. 13, 1970.]

EMMONS, WILLIAMS, MIRES & LEECH et al.,
Plaintiffs, Cross-defendants and Appellants, v.
THE STATE BAR OF CALIFORNIA, Defendant and Respondent;
SAN JOAQUIN COUNTY BAR ASSOCIATION, Defendant, Cross-
complainant and Respondent.

## COUNSEL

Emmons, Williams, Mires & Leech and Robert C. Mires for Plaintiffs, Cross-defendants and Appellants.

F. LaMar Forshee and Herbert M. Rosenthal for Defendant and Respondent.

Forrest E. Macomber for Defendant, Cross-complainant and Respondent.

## OPINION

**FRIEDMAN, Acting P. J.**—Plaintiff attorneys seek a declaratory judgment nullifying the San Joaquin County Bar Association's claim to a one-third forwarding fee arising from a piece of legal business which had originated with the bar association's lawyer reference service. Plaintiffs appeal from a summary judgment requiring them to pay the fee. The appeal comes up on an agreed statement of facts.

Plaintiff John Hertzer, an attorney and member of the San Joaquin

County Bar Association, signed a registration form enlisting himself on the panel of the lawyer reference service. According to the registration form, the panel member would charge the client a maximum of $5 for the first conference, while additional compensation would be a matter of agreement between the attorney and client. The registration form committed the lawyer to pay a one-third forwarding fee "to be paid to The Legal Aid Society, on all referrals."[1]

A few months later the lawyer reference service sent Hertzer a client who had a medical malpractice claim. Mr. Hertzer associated his fellow plaintiffs as co-counsel. Eventually the malpractice claim was settled and an attorney fee of almost $48,000 approved by court order. The attorneys are holding one-third of that fee in a trust account subject to the outcome of this action.

The registration form signed by Mr. Hertzer included a commitment to abide by present and future rules of the lawyer reference service. In 1963 the bar association had distributed a statement of "regulations," which included the following declaration: "The attorney is to deduct from any retainer fee given him the expected Court costs and one-third of the retainer fee minus the Court costs should be referred to the Lawyer Reference Service. If the client is to pay his fee to the attorney on instalments, the attorney need not refer back to the Lawyer Reference Service one-third of every payment as it is made. He should wait until he has received the balance of his fee and then refer to the Lawyer Reference Service one-third.

"If the client received a one-half hour consultation only from the attorney and the attorney receives a fee of $5.00 from the client, and no other services are rendered by the attorney, no part of that $5.00 need be paid back to the Lawyer Reference Service."

The declaratory relief action named both the San Joaquin County Bar Association and the State Bar of California as defendants. The former filed a cross-complaint and motion for summary judgment, seeking a money judgment for the forwarding fee. Both defendants filed general demurrers. The State Bar also interposed a demurrer for lack of jurisdiction. The trial court sustained the demurrers without leave to amend and granted the summary judgment motion. It entered a judgment that plaintiffs "take nothing" and that the bar association recover the disputed fee.

Essentially, plaintiffs claim that payment of the one-third forwarding fee would constitute fee-splitting with an unlicensed person and remunerating

---

[1]Neither the agreed statement of facts nor the registration form identified the Legal Aid Society either as a separate corporation or association or as a function or division of the bar association. We take judicial notice that the San Joaquin County Bar Association and the Legal Aid Society of San Joaquin County have filed articles of incorporation as separate nonprofit associations. The lawyer reference service, on the other hand, appears to be simply a function or activity of the bar association.

the person for obtaining professional employment, in violation of rules 2 and 3 of the Rules of Professional Conduct of the State Bar of California.[2]

The judgment of the trial court is cryptic. Contrary to Code of Civil Procedure section 472d, the court did not specify the ground for its order sustaining the demurrers without leave to amend. When coupled with these orders, the judgment's declaration that plaintiffs "take nothing" appears to be an outright rejection of their prayer for a declaration passing upon the fee contract's legality. Although the money judgment in favor of the San Joaquin County Bar Association is consistent with an adjudication of the contract's legality, it is also consistent with another theory advanced by the bar association: that, whatever the contract's illegality, the bar association is not *in pari delicto* and may therefore enforce its claim to the one-third forwarding fee. The latter theory is valid and requires affirmance of the judgment.

The rule denying recovery to a party to an illegal contract is subject to a wide range of exceptions. ■ " 'Where, by applying the rule [denying enforcement of illegal contracts], the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.' " (*Tri-Q, Inc.* v. *Sta-Hi Corp.,* 63 Cal.2d 199, 219 [45 Cal.Rptr. 878, 404 P.2d 486], quoting from *Norwood* v. *Judd* (1949) 93 Cal.App.2d 276, 289 [209 P.2d 24].) In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts. (*Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 150 [308 P.2d 713]; Strong, *The Enforceability of Illegal Contracts,* 12 Hastings L.J. 347, 362-

---

[2]The State Bar Act (Bus. & Prof. Code, § 6076) declares: "With the approval of the Supreme Court, the Board of Governors [of the State Bar of California] may formulate and enforce rules of professional conduct for all members of the bar in the State."

Rules 2 and 3 of the Rules of Professional Conduct provide in part:

"Rule 2. "Section a. A member of the State Bar shall not solicit professional employment by advertisement or otherwise.

"Rule 3. "A member of the State Bar shall not employ another to solicit or obtain, or remunerate another for soliciting or obtaining, professional employment for him; nor, except with a person licensed to practice law, shall he directly or indirectly share compensation arising out of or incidental to professional employment; nor shall he directly or indirectly aid or abet any person not so licensed, or any association or corporation, to practice law or to receive compensation therefrom. A member of the State Bar shall not knowingly accept professional employment offered to him as a result of or as an incident to the activities of any person not so licensed or of any association or corporation that for compensation controls, directs or influences such employment . . . ."

376 (1961).) ■ Applying this doctrine, we discern three reasons why assumed illegality of the fee-sharing arrangement does not compel the bar association's loss or permit plaintiff's retention of the forwarding fee.

First: The parties are not *in pari delicto.* We use the phrase not in the sense of comparative fault, but rather to mean that plaintiffs are raising an asserted prohibition applicable to themselves, not to the other party. (*Lewis & Queen* v. *N. M. Ball Sons, supra,* 48 Cal.2d at p. 153.) An analogy appears in *Cain* v. *Burns* (1955) 131 Cal.App.2d 439 [280 P.2d 888] (hg. den.).) There, a lay intermediary recovered his fee split from the attorney, because the law's prohibition was aimed at the lawyer alone.

Second: Plaintiffs will be unjustly enriched by denying the bar association's recovery. (*Tri-Q, Inc.* v. *Sta-Hi Corp., supra,* 63 Cal.2d at p. 219.) Mr. Hertzer, the panel member, effectually contracted to pay a forwarding fee of one-third. When he associated the other plaintiffs as co-counsel, they accepted a piece of legal business burdened with that financial commitment. They do not claim ignorance of it. A profitable piece of business came to them through the mechanism of the bar association's lawyer reference service and they should not escape their commitment to it.

Third: Assuming some appearance of illegality, the forfeiture resulting from a refusal to enforce the contract would be harsh in proportion to the character and extent of illegality. (*Lewis & Queen* v. *N. M. Ball Sons, supra,* 48 Cal.2d at p. 151.) The public policy guarded by the restriction does not call for nonenforcement as a means of protection. (*Tri-Q, Inc.* v. *Sta-Hi Corp., supra,* 63 Cal.2d at pp. 218-219.) The evolutionary nationwide development of the lawyer reference program, its generally discerned social value, the basic conformity between the general evolutionary development and the particular facility and, finally, the latter's quasi-public objectives— all lead to the conclusion that enforcement of the contract will not offend the policy underlying the Rules of Professional Conduct. This set of considerations requires some elaboration.

Serious and progressive elements, within and outside the legal profession, have for several decades sought means of making legal services more readily available to the public. Together with such movements or developments as group legal services[3] and legal aid, the lawyer reference program has

---

[3]See Progress Report, *Group Legal Services,* Standing Committee on Group Legal Services of California State Bar, 39 State Bar J. 639 (1964); Cheatham, *Availability of Legal Services: The Responsibility of the Individual Lawyer and of the Organized Bar,* 12 U.C.L.A.L. Rev. 438 (1965); Note, 11 A.L.R.3d 1206-1219.

Successive decisions of the federal Supreme Court involving group legal services have discerned constitutional protection for the right of lay organizations to refer members to selected or recommended attorneys. *N.A.A.C.P.* v. *Button* (1963) 371 *U.S.* 415 [9 L.Ed.2d 405, 83 S.Ct. 328]; *Brotherhood of Railroad Trainmen* v.

been evolved to establish communications between qualified attorneys and clients needing their services. While group legal service and legal aid include lawyer referral features, lawyer reference services as such have developed as a function of local bar associations. The organized bar of Los Angeles instituted the first operational lawyer reference service in 1937. Similar services have since been established in many American communities.[4] Through a series of committee studies and reports, the American Bar Association has evolved criteria for the operation of lawyer reference services by local bar associations. (See Handbook on the Lawyer Referral Service, Am. Bar Assn. (5th ed. 1965).)

In 1956 the Board of Governors of the State Bar of California adopted a resolution entitled "Minimum Standards for a Lawyer Reference Service in California." (We shall refer to this statement elliptically as "Minimum Standards.") These were largely derived from the criteria evolved by the American Bar Association. (See Meyer, *op. cit.* fn. 4.) The Minimum Standards have since been amended in some respects. In summary, they declare that a lawyer reference service may be operated only by a recognized bar association; that a comittee of the bar association must supervise it; that panel members must comply with its rules and regulations; that referrals of legal business must be made fairly and on a rotational basis; that a reasonable registration or forwarding fee or both may be required of panel members; that annual activity reports be filed with the State Bar.

A 1964 compilation (39 State Bar J. 942-943) lists 48 lawyer reference services of local bar associations in California. Thirty of these combined legal aid and lawyer reference facilities in a single office, while the remaining 19 consisted of lawyer reference service facilities only.

Classic attitudes, crystallized in canon and rule, frequently lag behind institutional and functional change. Developments in lawyer referral have moved ahead of a fundamental reexamination of conventional relationships between lawyer and client. Prior to the group legal service decisions of the federal Supreme Court (fn. 3, *supra*), the courts had condemned fee reten-

---

*Virginia State Bar* (1964) 377 U.S. 1 [12 L.Ed.2d 89, 84 S.Ct. 1113, 11 A.L.R.3d 1196]; *United Mine Workers* v. *Illinois State Bar Assn.* (1967) 389 U.S. 217 [19 L. Ed.2d 426, 88 S.Ct. 353]; see also, *Hildebrand* v. *State Bar* (1950) 36 Cal.2d 504 [225 P.2d 508], separate opinions of Carter, J. and Traynor, J.

[4]See Madden, *Lawyer Referral Service: A Sensible Approach to a Difficult Problem,* 49 A.B.A. J. 965 (1963); Cheatham, *A Lawyer When Needed: Legal Services for the Middle Classes,* 63 Colum. L. Rev. 973 (1963); Gallantz, *Lawyer Referral—A Brief History,* 45 J. Am. Jud. Soc'y. 306 (1962); Meyer, *Current Development of Lawyer Referral in California,* 45 J. Am. Jud. Soc'y. 309 (1962); Christensen, *Lawyer Referral Service: An Alternative to Lay-Group Legal Services?* 12 U.C.L.A. L. Rev. 341 (1965); see also, *Bibliographies on Lawyer Referral,* 45 J. Am. Jud. Soc'y. 324-325 (1962) and 12 U.C.L.A. L. Rev. 459-460 (1965).

tion by the referring lay organization as improper solicitation and improper fee-splitting. (*Hildebrand* v. *State Bar, supra,* 36 Cal.2d 504; 11 A.L.R.3d at pp. 1211-1216; see Simpson, *Group Legal Services: The Case for Caution,* 12 U.C.L.A. L.Rev. 327 (1965).) The Brotherhood of Railroad Trainmen case involved no fee-splitting. In *N.A.A.C.P.* v. *Button, supra,* the attorney received a salary from the organization and the client paid him no fee. The latter arrangement was specifically insulated from state interference in the *United Mine Workers* case, despite the Illinois Supreme Court's animadversion against any " 'financial connection of any kind' " between the labor union and the attorney. (*Illinois State Bar Assn.* v. *United Mine Workers of America, Dist. 12* (1966) 35 Ill.2d 112, 118 [219 N.E.2d 503, 506].)

Several decisions hold that a legal aid society is not engaged in unauthorized legal practice when it serves only as a conduit or intermediary to bring attorney and client together and has no control over the representation. (*Touchy* v. *Houston Legal Foundation* (Tex. 1968) 432 S.W.2d 690, 695; *Azzarello* v. *Legal Aid Society* (1962) 117 Ohio App. 471 [185 N.E.2d 566, 570].)

In the related area of lawyer reference services of bar associations, the American Bar Association Committee on Professional Ethics has issued an opinion declaring that contributions from panel members do not violate the canon against fee-splitting.[5] In *Jacksonville Bar Assn.* v. *Wilson* (Fla. 1958) 102 So.2d 292, published announcements inviting public use of the bar association's lawyer reference service were held not to violate the canons against advertising and solicitation. Pointing out that the announcements did not represent competitive striving for law business, the court observed: "Here is an organization of lawyers, which all in a given area may join, working cooperatively to lower the barrier between the legal profession and the public. Certainly the public must be attracted, and must be apprised of the availability of the service. . . . And alerting the public to the existence of a service, under bar sponsorship, which will provide . . . preventtive advice at a reasonable fee is not unethical, but must redound to the benefit both of the public and of the bar." (P. 295.)

According to a 1965 American Bar Association survey covering 170

---

[5]The opinion, Formal Opinion 291, dated August 1, 1956 (published in American Bar Association Opinions on Professional Ethics, 1967) states in part: "3. May the association require members of the panel to assist in the financing of the service, either by a flat fee or by a sliding scale charge based on the fees derived by the panel members from the cases referred to them?

"The financing of the plan should be under the control of the association setting it up. Registrants may be required to contribute to the expense of operating it by a reasonable registration charge or by a reasonable percentage of fees collected by them. The latter arrangement would not, in the opinion of the Committee, constitute a violation of Canon 34."

lawyer reference services, most of the services require the client to pay an initial consulting fee, usually in the $5 to $10 range. In some cases this initial fee is retained by the lawyer, in other cases shared with the referral service. Eighty-nine services reported that panel lawyers retained all additional fees, 22 that a percentage was remitted to the service. (Lawyer Referral Service, Summary of 1965 Annual Survey Questionnaires (Am. Bar Assn. 1966) p. 7.)

In California, rule 9 of the Minimum Standards adopted by the State Bar, declares: "A lawyer reference service may require of its panel members a reasonable registration or forwarding fee or both." According to the 1964 California compilation mentioned earlier (39 State Bar J. 942-943), 19 of the 49 reference services received a fraction of the panel members' fees. The specified fraction ranged from a low of 10 percent to a high of one-third. The Board of Governors of the State Bar has adopted several policy resolutions, all to the general effect that a lawyer reference service complying with the Minimum Standards "is not deemed to violate Rules 2 or 3, Rules of Professional Conduct." There has been no express amendment of the latter rules, however.[6]

In its general features—and quite aside from two idiosyncrasies discussed later—the Lawyer Reference Service of the San Joaquin County Bar Association is a manifestation of a general development within the American legal profession. It conforms to the basic outlines of the Minimum Standards. Plaintiffs' charge of illegality is bottomed upon the proposition that the fee-sharing permission ostensibly extended by the Minimum Standards does not limit the prohibitions in rules 2 and 3, Rules of Professional Conduct (fn. 2, *supra*), since the Minimum Standards have never been submitted for the approval of the State Supreme Court.

Whether the Minimum Standards actually work a modification of rules 2 and 3 is a question not affecting entitlement to the money in suit. It is enough that the basic features of the San Joaquin County arrangement do not offend the public policy underlying these canons. There are wide differences—in motivation, technique and social impact—between the lawyer reference service of the bar association and the discreditable fee-splitting featured in the disciplinary decisions. Prohibited fee-splitting between lawyer and layman carries with it the danger of competitive solicitation (*Crawford* v. *State Bar*, 54 Cal.2d 659, 666 [7 Cal.Rptr. 746, 355 P.2d 490]); poses the possibility of control by the lay person, inter-

---

[6]In the related areas of group legal service and legal aid the State Bar governors proposed and the Supreme Court on January 20, 1970, approved new rules 20 and 21, Rules of Professional Conduct (1 Cal.3d Rules pp. 51-58) establishing criteria for such activities and declaring that participating lawyers would not be in violation of rules 2 and 3.

ested in his own profit rather than the client's fate (*Utz* v. *State Bar*, 21 Cal.2d 100, 108 [130 P.2d 377]); facilitates the lay intermediary's tendency to select the most generous, not the most competent, attorney (*Linnick* v. *State Bar*, 62 Cal.2d 17, 21 [41 Cal.Rptr. 1, 396 P.2d 33]; *Hildebrand* v. *State Bar*, 36 Cal.2d 504, 523 [225 P.2d 508], separate opinion of Traynor, J.). Rule 3's prohibition against lay intermediaries seeks to bar both solicitation and the presence of a party demanding allegiance the lawyer owes his client. (*People* v. *Merchants Protective Corp.* (1922) 189 Cal. 531, 539 [209 P. 363].) None of these dangers or disadvantages characterizes the San Joaquin County Bar Association's lawyer reference activity. The bar association seeks not individual profit but the fulfillment of public and professional objectives. It has a legitimate, nonprofit interest in making legal services more readily available to the public. When conducted within the framework conceived for such facilities, its reference service presents no risks of collision with the objectives of the canons on fee-splitting and lay interposition.

We turn to the two idiosyncrasies mentioned earlier. By the measure of the 1964 California compilation, published in 39 State Bar Journal, pages 942-943, the one-third forwarding fee charged by the San Joaquin County Bar Association is the highest in California.[7] Of the other 18 California lawyer reference services which impose a percentage forwarding fee, 12 specified a fee of 10 percent, 5 a fee of 20 percent, and 1 a fee of 25 percent. Indeed, on the assumption that the American Bar Association's 1965 survey, *supra*, covered the San Joaquin County referral service, the latter's one-third demand is the highest in the United States.

Notably also, there is a contradiction between the registration form signed by the panel member and the "regulations" issued by the San Joaquin County Bar Association. The former requires payment of the one-third forwarding fee to the Legal Aid Society, the latter to the lawyer reference service. As noted earlier (fn. 1), these two services are operated by separate entities. The agreed statement on appeal does not reveal the budgetary connections, if any, between the two services; nor whether, in fact, fee income is used to defray operating expenses of both services. The American Bar Association's Formal Opinion Number 291 (fn. 5, *supra*) describes a fee-sharing arrangement for the limited purpose of financing the operations of the reference service. The Minimum Standards of the California State Bar are silent on that score. One objective of fee-splitting inhibitions is avoidance of arrangements which unnecessarily inflate the client's cost. (*Alpers* v. *Hunt* (1890) 86 Cal. 78, 88 [24 P. 846].) The size of the forwarding fee in relation to

---

[7]The agreed statement includes this compilation as part of the record on appeal.

the operating budget of the bar association's lawyer reference service bears upon compliance with the "reasonable" fee limitation of rule 9 of the Minimum Standards. Systematic use of fee income for bar association activities other than the lawyer reference service may be inconsistent with the policy underlying rule 3 of the Rules of Professional Conduct. (See *Hildebrand* v. *State Bar, supra,* 36 Cal.2d at p. 510; cf. *Estate of Miller* (1936) 5 Cal.2d 588, 595 [55 P.2d 491].)

We do not pass upon these possibilities. In its basic character, this particular lawyer reference service conforms to the general pattern of such facilities and does not offend the policy objectives of the canons. At worst, the two peculiar characteristics of the San Joaquin County program collide only peripherally with the professional canons. In the absence of any prior administrative or judicial condemnation, they do not create such illegality that the courts will refuse enforcement of the fee contract. (Cf. *Hildebrand* v. *State Bar, supra,* 36 Cal.2d at p. 514.)

█ We uphold the trial court's order sustaining demurrers and refusing leave to amend the complaint for declaratory relief, because plaintiff's claim of illegality raised only an abstract argument which did not affect entitlement to the forwarding fee. (*Hagan* v. *Fairfield* (1965) 238 Cal. App.2d 197, 202 [47 Cal.Rptr. 600].) The absence of a triable issue of fact justified the summary money judgment in favor of the San Joaquin County Bar Association. (Code Civ. Proc., § 437c.) The State Bar makes an additional assertion, that it is not a proper party, having no stake in the controversy. Since we affirm the judgment for the reasons stated in this opinion, we do not consider that contention.

Judgment affirmed.

Regan, J., and Janes, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 10, 1970.