[No. A101673. First Dist., Div. Two. Aug. 3, 2004.]

J. NICHOLAS McINTOSH, Plaintiff and Appellant, v.
ROBERT W. MILLS et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Steven J. Brady, Steven J. Brady and Bryce C. Anderson for Plaintiff and Appellant.

Coblentz, Patch, Duffy & Bass, Jonathan R. Bass, Howard A. Slavitt and Zuzana Svihra for Defendants and Respondents.

OPINION

RUVOLO, J.—

## I.

## INTRODUCTION

Appellant J. Nicholas McIntosh appeals from a summary judgment entered in favor of respondent Robert W. Mills (Mills).[1] The trial court granted Mills's summary judgment after concluding, as a matter of law, that an alleged[2] agreement to share a legal fee (the fee-sharing agreement) entered into between Mills, a member of the State Bar of California, and McIntosh, a nonattorney, was unenforceable.[3] In reviewing the matter de novo, we agree that the fee-sharing agreement was unenforceable under the doctrine of illegality of contract. Further, we conclude that no exception to the general rule of unenforceability applies in that the parties were in pari delicto as a matter of law because (1) McIntosh was represented by counsel, Attorney David Anton, who also negotiated and entered into the fee-sharing agreement on McIntosh's behalf, and (2) McIntosh is equally as blameworthy as Mills.

## II.

## PROCEDURAL BACKGROUND

In the underlying complaint, McIntosh filed a single cause of action against Mills for breach of contract, alleging that Mills failed and refused to honor an

---

[1] We refer to respondents throughout this opinion in the singular for clarity's sake, and because the alleged conduct of respondent Mills formed the basis for McIntosh's lawsuit. However, The Mills Law Firm was a defendant below in whose favor summary judgment was also granted, and the firm is a named respondent as well.

[2] Both in the trial court and on appeal, Mills has continued to deny that any agreement to share attorney fees was made with McIntosh. However, for purposes of summary judgment, Mills has assumed the truth of the allegations contained in the first amended complaint and as testified to by McIntosh in his deposition. Likewise, this opinion, which reviews a summary judgment, does, as it must, assume the existence of such a contract.

[3] The process by which an attorney gives a portion of a fee to a nonattorney is referred to in both the California Rules of Professional Conduct (CRPC) and the American Bar Association Model Rules of Professional Conduct (Model Rules) as "fee sharing" (rules 1-320(A) and 5.4(a), respectively). Where a portion of the fee is given to another attorney, both codes use either the verb "divide" (CRPC, rule 2-200) or "division of fee" (Model Rules, rule 1.5(e)). Therefore, we will refer to the promise by Mills to give a portion of his eventual fee in the Bank of America litigation to McIntosh as an agreement to "share fees" or "fee sharing," or the fee-sharing agreement. We will use the terms "fee splitting" or "splitting of fees" only where those phrases are used by other sources or authorities, and then, only when we quote from the text.

agreement to share attorney fees with McIntosh. No other legal or equitable causes of action were pleaded. The fee-sharing agreement arose out of McIntosh's oral agreement to assist Mills in preparing civil actions against Bank of America in two cases, *Carol F. Nickel et al. v. Bank of America National Trust & Savings Association et al.* (the *Nickel* action), and *Fisher et al. v. Bank of America National Trust & Savings Association et al.* (the *Fisher* action).[4] In return for his consulting services, McIntosh was to receive 15 percent of all attorney fees Mills earned as a result of the prosecution of either or both actions. The consulting agreement was allegedly entered into in 1994.

The complaint further alleged that the *Fisher* action was settled in 1999, and Mills received total attorney fees of approximately $7 million. The *Nickel* action was allegedly settled in 2001, and Mills received total attorney fees of approximately $14.7 million. McIntosh demanded payment under the fee-sharing agreement, but Mills refused to make payment.

Mills filed a motion for summary judgment in October 2002, claiming the fee-sharing agreement was unenforceable as a matter of law because it was illegal. Mills also claimed that McIntosh was barred from seeking relief for the breach of the parties' agreement by the equitable doctrines of unclean hands and judicial estoppel. McIntosh opposed the motion.

On November 27, 2002, the trial court held that Mills was not entitled to summary judgment on the alternative grounds of unclean hands and judicial estoppel.[5] However, the court granted Mills's motion for summary judgment on the ground that the alleged agreement to share attorney fees with McIntosh was illegal, and thus, unenforceable. Judgment was entered on December 16, 2002, and this appeal followed.

## III.

## DISCUSSION

### A. Standard of Review

On appeal from a summary judgment we undertake a de novo review of the proceedings below, and independently examine the record to determine

---

[4] Although McIntosh alleged in his complaint that he agreed to provide consulting services in *two* separate class actions against Bank of America, the parties to this appeal refer to the agreement and his claim in the singular, and we will do likewise, since resolution of the claims involved the same issues.

[5] Because we conclude that the court correctly determined that the agreement was illegal and unenforceable as a matter of law, we need not consider whether the trial court erred in denying Mills's motion on these alternative grounds.

whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158] (*Kids' Universe*).) We review the trial court's ruling, not its rationale; thus, we are not bound by the trial court's stated reasons for granting summary judgment. (*Kids' Universe, supra,* 95 Cal.App.4th at p. 878.)

The Supreme Court has described our duty as follows: "In ruling on the motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom ([Code Civ. Proc.,] § 437c, subd. (c)), and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "All doubts as to whether there are any triable issues of fact are to be resolved in favor of the party opposing summary judgment. [Citation.]" (*Ingham v. Luxor Cab Co.* (2001) 93 Cal.App.4th 1045, 1049 [113 Cal.Rptr.2d 587].)

"Therefore, if a plaintiff in response to a defendant's summary judgment request demonstrates the existence of a triable dispute with 'specific facts' (§ 437c, subd. (o)(2)) by making a prima facie showing of the merit of the complaint, the motion must be denied. There is to be no weighing of evidence. [Citations.]" (*Kids' Universe, supra,* 95 Cal.App.4th at p. 880.) Moreover, equally conflicting evidence requires denial of a summary judgment motion and a trial to resolve the dispute. (*Ibid.*; see also *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 724 [110 Cal.Rptr.2d 528, 28 P.3d 249]; *Livingston v. Marie Callenders, Inc.* (1999) 72 Cal.App.4th 830, 839–840 [85 Cal.Rptr.2d 528].)

### B. Summary Judgment Was Properly Granted on the Ground the Subject Agreement to Share Fees Was Illegal and Unenforceable

#### 1. *The Facts Adduced on Summary Judgment Concerning the Fee-sharing Agreement Between McIntosh and Mills*[6]

In the late 1980's, McIntosh worked in the Northern California investment group for Security Pacific, which later was merged into Bank of America. The merger became final in 1992, and McIntosh was then terminated for the

---

[6] Facts are taken from the record submitted by both sides in connection with Mills's motion for summary judgment. Consistent with the burden on summary judgment, to the extent the evidence may be in conflict, only those facts favorable to McIntosh are discussed.

ostensible reason that he had been recruiting Bank of America accounts (specifically, the "widows and orphans fund") for a new company he was forming. During the years he worked at the bank, McIntosh noticed "several indiscretions" about which he complained.

In early 1994, McIntosh employed Attorney David Anton (Anton) as his agent for the purpose of reaching an agreement with Mills by which McIntosh would provide services assisting Mills in banking-related legal matters Mills either was handling or was going to handle. McIntosh gave Anton "complete power and authority" to negotiate an agreement with Mills relating to McIntosh's work. McIntosh had given Anton "carte blanche" to negotiate with Mills on his behalf because he did not know "how these things worked."

Likewise, Anton told Mills that the financial arrangements were to be negotiated with Anton alone, and that Anton had authority to accept the arrangement without communicating the specifics to McIntosh so that McIntosh, if asked, would be in a position to state he did not know what arrangements existed. This agency relationship between Anton and McIntosh was not in writing.

Mills had first broached the possibility of compensation casually during a meeting at Anton's law office on February 22, 1994. In addition to Mills and Anton, McIntosh and another attorney in The Mills Law Firm were present. Mills mentioned it was apparent that McIntosh had valuable information about what was going on at the bank, and some thought should be given to retaining him.

In his deposition, Anton explained that an agreement to pay McIntosh compensation was reached with Mills as of April 27, 1994, subject to the contingency that Mills's reputation, through references, would reflect that he was the type of person with whom McIntosh should work.[7] At the April 27th meeting, Mills confirmed that he thought McIntosh could be of invaluable assistance in pursuing litigation against Bank of America; however, Mills was unwilling to consider hourly compensation. Mills opposed an hourly arrangement because he did not want a paper trail of payments from him to McIntosh while the cases were pending, and because Mills wanted the rate structure to be contingent on how well Mills did in the litigation. Anton and

---

[7] This contingency was removed in the first half of the following month.

Mills then discussed Mills's desire that if only a lodestar[8] fee recovery was achieved, McIntosh would receive only 7 percent of the fee.

Anton claimed that the need to keep the agreement secret was first raised by Mills. Mills also did not want the issue of the agreement discussed with anyone else in The Mills Law Firm. He told Anton that because McIntosh was a potentially important witness, it was best that other lawyers in his firm not know about the arrangement. Mills also did not want either side to keep any writings about the agreement, for fear that counsel for the bank might "[g]et wind of something" and subpoena their records. For this reason, neither attorney made any writings about their discussions.[9]

In 1996, Mills reemphasized it was critical that the arrangement be kept secret because his firm might be removed as counsel if the terms of the agreement with McIntosh came to light. His concern stemmed from his belief that the agreement could be viewed as "inappropriate."

Anton had been a practicing attorney in California since 1980. When asked during his deposition if he was aware that sharing a contingency fee between an attorney and a nonattorney might be illegal, Anton stated that he "was aware that something like that existed, but [he] didn't know what the parameters were." He did not research the ethics of the arrangement, although he was aware there were "rules of professional conduct" governing the conduct of attorneys. He really was not concerned since it was Mills's fee that Mills wanted to share, not Anton's fee. Therefore, if there was any cause for apprehension, it was Mills's concern.

From his discussions with Mills, Anton stated there was a "clear meeting of the minds" as to the terms of the fee-sharing agreement. He felt uncomfortable not being able to tell McIntosh what the terms were, but he had no

---

[8] "The use of the lodestar method for calculating attorney fees was established in California in *Serrano III* [*Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*)]. As we recently noted, '[i]n so-called fee shifting cases, in which the responsibility to pay attorney fees is statutorily or otherwise transferred from the prevailing plaintiff or class to the defendant, the primary method for establishing the amount of "reasonable" attorney fees is the lodestar method. The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier" to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented.' (*Lealao* [*v. Beneficial California, Inc.* (2000)] 82 Cal.App.4th 19, 26 [97 Cal.Rptr.2d 797].)" (*Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 833 [112 Cal.Rptr.2d 284].)

[9] Nevertheless, Anton stated in his responses to form interrogatories that in 1996, Mills and Anton corresponded in writing about the terms of the agreement reached in 1994. The record before us includes a letter dated February 13, 1996, from Mills to Anton, but the subject is a division of fees between their respective law firms, not between Mills and McIntosh.

doubt that an agreement had been reached. What he did tell McIntosh was "cryptic." He told him that "things were set and he was to cooperate fully in any way he could with [Mills's] requests [in the bank cases]. . . ." What he intended to communicate to McIntosh was that an agreement had been reached, that there was no way Anton was going to tell McIntosh the terms, but that McIntosh had to cooperate in order to meet his end of the bargain. Based on his interactions with McIntosh, Anton concluded that McIntosh had an expectation or belief that an arrangement had been made but he did not know the specifics of that arrangement.

Prior to being deposed in any of the bank cases, Anton discussed the areas of expected questioning with McIntosh. He considered possible questions about whether McIntosh had authorized anyone to negotiate any form of compensation with Mills. Anton told McIntosh that if that type of question were asked, McIntosh would have to "fess up."

McIntosh testified in his deposition in *this* case that he knew an agreement had been reached between Anton and Mills in either 1994 or 1995 but he "was never really told the precise details of the agreement." Anton was asked to handle the arrangements since he was an attorney, and he negotiated as McIntosh's agent or representative. At the time Anton was meeting with Mills in 1994 about the agreement, McIntosh was told that the case could be a big one. In response, he told Anton that he was willing to help Mills on the case "but I want a fair piece." From this discussion with Anton, McIntosh knew his "return would be fair and it would be substantial." He figured from internal discussions that the bank's overcharging could be as much as a $100 million, and attorneys get paid anywhere from 25–35 percent out of recovery. Therefore, McIntosh concluded that in light of the potential recovery, he expected to receive a "fair percentage out of it." He knew that the harder he worked on the cases, the more the attorneys would get, and the better off he would be; if they did well, he would do well.

McIntosh also testified in this case that in 1994 he did not expect to assist Mills (other than as compelled through legal process) without an agreement for compensation. It was only after he understood that Anton had reached an agreement with Mills that McIntosh began assisting Mills in the cases. The work McIntosh did for Mills included providing Mills's law firm with open access to his own files; fielding "an infinite number" of questions from members of the firm about documents, bank practices, and employee records; and consulting about how to depose bank employees, including what questions to ask.

McIntosh learned of the specific terms of the fee-sharing agreement when he and Anton discussed Anton's May 25, 1999 letter to Mills requesting

payment. However, in the years after 1994, McIntosh sought confirmation periodically from Anton that he still had an agreement in place with Mills.

In January 30, 1998, McIntosh was deposed in the bank case entitled *Fluty v. Bank of America*, during which the following exchange took place:

"Q: Did you ever ask for any compensation for the time that you spent talking with people from the Mills Firm?

"A: I think they bought me lunch once or maybe twice.

"Q: Did you ever ask for any other compensation?

"A: No."

Several days later, McIntosh was deposed in the *Fisher* action. In attendance were both Anton and a member of The Mills Law Firm. During that deposition, the following exchange took place:

"Q: Have you been promised any payment in connection with this litigation?

"A: No

"[¶] . . . [¶]

"Q: Have you been told that there's any possibility that you'll receive any money whatsoever as a result of this lawsuit?

"A: No. Am I missing something?

"Q: I'm just trying to distinguish between being compensated for your time testifying as opposed to any other money you might receive arising out of this lawsuit.

"A: No."

Anton sat in as counsel when Bank of America deposed McIntosh. He heard McIntosh deny there was any possibility he would receive any money whatsoever as a result of that lawsuit. Anton was feeling "very uncomfortable" during this line of questioning, but he did not know what to do. His discomfort stemmed from the fact that he and Mills had worked hard to make this "weird" arrangement, they knew the day would come when they would be confronted with these precise questions to McIntosh, and "damn, they

were getting close." When asked during his deposition if he thought McIntosh testified truthfully in the *Fisher* action, Anton said, "I don't know what I thought about that." The following exchange then took place:

"Q: You didn't think by answering 'no' to that question Mr. McIntosh was perjuring himself?

"A: I didn't think about that at the time that way.

"Q: Why not?

"A: Because he was being asked about his thoughts. I don't know. I knew I felt very uncomfortable because I thought he should have expected it to be a 'yes.' "

McIntosh filed a supplemental declaration in opposition to the motion for summary judgment below. In it McIntosh stated that at the time of the *Fisher* deposition he knew only that "some sort of agreement" had been reached between Mills and Anton, but he denied having any "specific information that I was to be compensated at all, much less the manner and extent of that compensation."

In May 1999, McIntosh was informed by Anton that Mills had settled the *Fisher* action, and that Anton and Mills had discussed compensation for McIntosh. In a letter dated May 25, 1999, requesting payment, Anton "confirm[ed] that the Real Estate Partnership cases against Bank of America were cases in which there was an agreement with your firm and Mr. McIntosh for a fee, call it a referral fee." Anton further stated that the terms of the "referral" were for McIntosh to receive 15 percent of the gross attorney fees recovered, and that Anton understood that Mills had settled the class action. Anton concluded the letter by requesting Mills to call him "so that we may review this situation." Mills rejected the demand. Two years later, McIntosh filed this action for breach of contract.

## 2. The Doctrine of Illegality Applies to the Agreement Between McIntosh and Mills to Divide the Nickels and Fisher Fees

 To analyze McIntosh's assignment of error, we must first determine if the doctrine of illegality applies to the fee-sharing agreement between McIntosh and Mills. This is a question of law that we decide de novo. (*Bovard v. American Horse Enterprises, Inc.* (1988) 201 Cal.App.3d 832, 838 [247 Cal.Rptr. 340]; see also *Russell v. Soldinger* (1976) 59 Cal.App.3d 633, 642 [131 Cal.Rptr. 145].)

"The illegality of contracts constitutes a vast, confusing and rather mysterious area of the law." (Strong, *The Enforceability of Illegal Contracts* (1961) 12 Hastings L.J. 347 (Strong).) Nevertheless, enacted as part of the original Field Codes, the contractual doctrine of illegality has been codified in this state since 1872, and appears as Civil Code section 1608: "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Thus, where the illegal consideration goes to the whole of the promise, the entire contract is illegal. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 429, p. 386.)[10]

In turning to the question of whether the fee-sharing agreement in the instant case was illegal, we initially determine whether the agreement's subject matter violates a professional ethics rule enacted to govern the conduct of members of the State Bar. (*Chambers v. Kay* (2002) 29 Cal.4th 142, 148 [126 Cal.Rptr.2d 536, 56 P.3d 645].) Subject to exceptions manifestly inapplicable here, current rule 1-320(A) of the CPRC[11] admonishes with stark brevity: "Neither a member [of the State Bar] nor a law firm shall directly or indirectly share legal fees with a person who is not a lawyer, . . ." This is not an ethics rule of recent vintage, for the State Bar's general prohibition against sharing fees with nonmembers was adopted by the California Supreme Court as part of former rule 3 on December 1, 1944,[12] and was later reenacted as rule 3-102(A), as part of the 1975 CPRC.[13]

While certain legal commentators have criticized perpetuating the ban on most lawyer/layperson fee-sharing agreements,[14] courts have consistently

---

[10] Readers who are schooled in the law may regard this doctrine with nostalgic fondness as they recall being instructed in the "somewhat artificial distinction" between contracts that are malum prohibitum (illegality set by statute), and malum in se (illegality based on base morals). (1 Witkin, Summary of Cal. Law, *supra*, Contracts, §§ 441 & 447, pp. 396, 399–400; see *Smith v. Bach* (1920) 183 Cal. 259, 262 [191 P. 14].) The principal remaining distinction between the two types of illegal contracts is that malum prohibitum contracts may be enforceable despite their illegality if the parties were not in pari delicto, a legal principle we turn to next, and which is at the heart of McIntosh's claim. There is no question that the agreement at issue in this case is one malum prohibitum, as its illegality derives from violation of statute, and is not grounded in common standards of morality.

[11] This version of CPRC, rule 1-320(A) became effective by order of the Supreme Court as of September 14, 1992.

[12] The pertinent part of former Rule 3 stated: "[N]or, except with a person licensed to practice law, shall he [or she] directly or indirectly share compensation arising out of or incidental to professional employment . . . ." (Rules Prof. Conduct, printed at 26 Cal.2d 32, 34.)

[13] Again, subject to certain enumerated exceptions not material here, that rule stated: "A member of the State Bar or the member's firm shall not directly or indirectly share legal fees except with a person licensed to practice law . . . ." (CPRC, former rule 3-102(A).)

[14] See Hazard and Hodes, The Law of Lawyering (3d ed. 2001) Part V, § 45.6, p. 45-7; Fischer, *Why Can't Lawyers Split Fees? Why Ask Why, Ask When!* (1992) 6 Geo. J. Legal Ethics 1.

upheld the prohibition based on a number of legitimate concerns. As summarized by the court in *Emmons, Williams, Mires & Leech v. State Bar* (1970) 6 Cal.App.3d 565 [86 Cal.Rptr. 367] (*Emmons*): "Prohibited fee-splitting between lawyer and layman carries with it the danger of competitive solicitation (*Crawford v. State Bar* [1960] 54 Cal.2d 659, 666 [7 Cal.Rptr. 746, 355 P.2d 490]); poses the possibility of control by the lay person, interested in his own profit rather than the client's fate (*Utz v. State Bar* [1942] 21 Cal.2d 100, 108 [130 P.2d 377]); facilitates the lay intermediary's tendency to select the most generous, not the most competent, attorney (*Linnick v. State Bar* [1964] 62 Cal.2d 17, 21 [41 Cal.Rptr. 1, 396 P.2d 33]; *Hildebrand v. State Bar* [1950] 36 Cal.2d 504, 523 [225 P.2d 508], separate opinion of Traynor, J.). Rule 3's prohibition against lay intermediaries seeks to bar both solicitation and the presence of a party demanding allegiance the lawyer owes his client. (*People v. Merchants Protective Corp.* (1922) 189 Cal. 531, 539 [209 P. 363].)" (*Emmons, supra,* 6 Cal.App.3d at pp. 573–574.)

Attorney ethics panels, both in and out of state, have been moved to embrace rules against fee sharing with nonattorneys out of concern for interference with the attorney's professional judgment, the creation of conflicts of interest, and the unwholesome spectre of attorneys soliciting professional liaisons with laypersons.[15] (See State Bar Compendium on Prof. Responsibility, Bar Assn. of S.F., Ethics Opns. of the Legal Ethics Com., Formal Op. No. 1976-2, pp. IIB-79–86; ABA/BNA Lawyers' Manual on Prof. Conduct [Lawyers' Manual], ABA Formal Ethics Opn. No. 95-392 (Apr. 24, 1995) [applying Model Rule 5.4]; Lawyers' Manual, State Bar of Montana Ethics Opn. No. 950411 (Apr. 11, 1995) [same].) One authority has also suggested that fee sharing tends to increase the total fees charged to clients, presumably in an effort by the attorney to "make up" that portion being paid to the third party. (Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2003) ¶ 5:510, p. 5-66.14 (rev. # 1, 2003).)

The potential problems associated with fee sharing are perceived to be particularly acute when viewed in the context of class action litigation where

---

[15] Defying labels, these concerns can take various forms. For example, the specific concern in one case may be that the attorney not allow the layperson to improperly influence the attorney's handling of the matter out of concern that future referrals from that lay source not be put in jeopardy. In another case, the concern may be that the vigor and diligence with which the layperson will continue to provide support services in the fee-sharing case will be affected by the amount of the fee the layperson expects. In another case, the layperson's willingness to devote attention to the case may be adversely affected if the attorney's decisions in the case do not comport with the views of the layperson. In yet another case, the concern may be that the attorney's handling of the matter may be adversely affected if the fee-sharing agreement turns out to be disadvantageous to the attorney as the case unfolds.

unique, and sometimes intractable, conflicts may already exist. These conflicts appear most commonly as "agency issues" resulting from the fact that the attorney is usually retained by a single or small group of named plaintiffs but who also represents a large class of unnamed individuals. Because of the extent of the potential conflicts arising from the settlement of class action litigation, it has been suggested that courts should take special care to ensure accountability by the attorney to nonpresent class members. (Molot, *An Old Judicial Role for a New Litigation Era* (2003) 113 Yale L.J. 27, 46–58.)

■ In light of these public interest concerns, and because there is no dispute here that the agreement at issue between McIntosh and Mills clearly violates CPRC, rule 1-320(A), we conclude that the doctrine of illegality applies facially to their fee-sharing agreement. (Cf., *Cain v. Burns* (1955) 131 Cal.App.2d 439, 442 [280 P.2d 888] (*Cain*).)

Even if the agreement is illegal because it violates a rule of professional conduct, McIntosh argues that it is illegal only as to Mills because McIntosh is not a member of the State Bar of California, and thus, not subject to the CPRC governing attorney conduct. We disagree.

■ First, we note that the doctrine of illegality considers whether the *object* of the contract is illegal. It does not turn on whether the illegality applies to the *party* seeking to enforce the agreement. For example, an agreement between a licensed adult and an unlicensed minor by which the minor agrees to drive a delivery vehicle for the adult is illegal and unenforceable by the adult despite the fact the party seeking to enforce the agreement (the adult) is a legal driver. As the above authorities make clear, the doctrine of illegality focuses on the object of the contract because it is grounded on considerations of public policy: "The effect to be given to an illegal element of a contract should not depend upon who alleges and proves it nor upon the manner in which it comes to the attention of the court. Rather, it should depend upon how the court can best serve the interest of the public and, when not inimical to the public interest, do justice to the parties." (Strong, *supra*, 12 Hastings L.J. at p. 350, fn. omitted.)

Furthermore, McIntosh's contention that he should be allowed to enforce the agreement because he is not bound by the rules of legal ethics is really a variation of his argument that his own conduct is less blameworthy than that of Mills, and, therefore, he should be entitled to enforce the parties' agreement despite its facial illegality. It is to this subsidiary argument that we now turn.

### 3. *No Exception to the Unenforceability of Illegal Fee-sharing Agreements Exists Because the Parties Were In Pari Delicto as a Matter of Law*

Because of the harsh results that might be visited on innocent parties to a contract when their agreement is voided for illegality, courts have fashioned exceptions. One court has observed that the need to void contracts in violation of the law must be tempered by the countervailing public interest in preventing a contracting party from using the doctrine to create an unfair windfall. (*Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 152 [308 P.2d 713].)

Thus, a number of exceptions have been recognized. (*Wells v. Comstock* (1956) 46 Cal.2d 528 [297 P.2d 961] [contract for sale of stock enforced where illegality affecting the transaction is not relied on by the parties]; *Calvert v. Stoner* (1948) 33 Cal.2d 97 [199 P.2d 297] [attorney fee provision in retainer agreement enforced where illegal provision prohibiting client from settling is severable]; *City Lincoln-Mercury Co. v. Lindsey* (1959) 52 Cal.2d 267 [339 P.2d 851] [automobile installment contract enforced where statute establishing illegality contains express sanction for violation]; *Strauss v. Bruce* (1934) 139 Cal.App. 62, 66 [33 P.2d 71] [usurious interest rate inserted into loan agreement by mistake].)

█ Perhaps the most common exception to the rule of invalidity, and the one McIntosh argues here, is the in pari delicto exception. At its most fundamental level, the exception allows an illegal contract to be enforced "so long as the party seeking its enforcement is less morally blameworthy than the party against whom the contract is being asserted, and there is no overriding public interest to be served by voiding the agreement." (See Strong, *supra*, 12 Hastings L.J. at p. 362; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 451, pp. 401–402.) The trial court found, as a matter of law, that McIntosh was not entitled to invoke this doctrine because "there is 'serious moral turpitude' on the part of the plaintiff and the defendants are not guilty of the greatest *moral* fault." (Italics in original.)

In arguing that he was not in pari delicto as to the fee-sharing agreement at issue in this case, McIntosh attempts to align the facts with those of several decisions that enforced contracts despite their illegality. The first of these is *Cain, supra,* 131 Cal.App.2d 439. There, the plaintiff was a private investigator who had performed services for the defendant/attorney in return for which the attorney agreed to pay the investigator/plaintiff one-third of the net attorney fees recovered. The attorney sought to avoid the contractual obligation to pay, claiming the "fee-splitting" agreement violated former rule 3, the predecessor to CPRC, rule 1-320(A). (131 Cal.App.2d at p. 441.)

The court began by observing that, despite the fact that the "fee-splitting agreement" was against public policy, it would be enforceable if the parties were not in pari delicto. (*Cain, supra,* 131 Cal.App.2d at pp. 442–443.) It quoted the general exception from the decision in *Norwood v. Judd* (1949) 93 Cal.App.2d 276 [209 P.2d 24], language which McIntosh refers to with relish in his brief: " 'But the courts should not be so enamored with the Latin phrase 'in pari delicto' that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realties of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.' [Citations.]" (*Cain, supra,* 131 Cal.App.2d at p. 444, italics omitted.)

In considering the relative culpability of the contracting parties, the court noted that the statute (former rule 3) was directed at only members of the State Bar, and it lacked any direct reach over the conduct of laypersons. (*Cain, supra,* 131 Cal.App.2d at p. 443.) Accordingly, the court explained that to allow the attorney to assert his own failure to comply with professional rules as a sword to deny otherwise lawful payment to a nonattorney who had indisputably performed under the contract "would put a premium on the attorney's disregard of the rules made for his guidance and conduct." (*Id.* at p. 444.)[16]

The second case is *Emmons, supra,* 6 Cal.App.3d 565, in which the plaintiff law firm preemptively filed a declaratory relief action seeking a declaration "nullifying" its agreement to pay the San Joaquin County Bar Association a portion of a fee earned on a case referred by the association's lawyer referral service. (*Id.* at p. 567.) After setting forth the general rule of illegality and the exception for circumstances where the parties are not in pari delicto, the court's analysis led it to conclude that the agreement was enforceable despite the ultra vires objective.

Without question, the defining feature in *Emmons* was that the fee sharing was with a local bar association's legal referral service, an entity devoted to

---

[16] While certainly the voiding of a fee-sharing agreement may result in the lawyer receiving more of a fee than entitled under the agreement, the court's observation does not address the countervailing factors such as whether the layperson with whom the fees were to be shared is entitled to assert equitable claims, including quantum meruit, against the attorney or the deterrent effect almost certain prosecution by the State Bar will have on attorneys contemplating such arrangements. (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453 [9 Cal.Rptr.3d 693, 84 P.3d 379] )

public service and benefit. After chronicling the growth and acceptance of not-for-profit lawyer referral services both in California and nationally, the court concluded: "In its general features . . . the Lawyer Reference Service of the San Joaquin County Bar Association is a manifestation of a general development within the American legal profession. It conforms to the basic outlines of the Minimum Standards [for State Bar sanctioned lawyer referral services] . . . .

"Whether the Minimum Standards actually work a modification of rules 2 and 3 is a question not affecting entitlement to the money in suit. It is enough that the basic features of the San Joaquin County arrangement do not offend the public policy underlying these canons. There are wide differences—in motivation, technique and social impact—between the lawyer reference service of the bar association and the discreditable fee-splitting featured in the disciplinary decisions. . . ." (*Emmons, supra,* 6 Cal.App.3d at p. 573.)

After recounting the public interest objectives that would generally be furthered by prohibiting lawyer/layperson fee-sharing agreements (quoted, *ante*, at p. 348), the court stated: "None of these dangers or disadvantages characterizes the San Joaquin County Bar Association's lawyer reference activity. The bar association seeks not individual profit but the fulfillment of public and professional objectives. It has a legitimate, nonprofit interest in making legal services more readily available to the public. When conducted within the framework conceived for such facilities, its reference service presents no risks of collision with the objectives of the canons on fee-splitting and lay interposition." (*Emmons, supra,* 6 Cal.App.3d at p. 574.)

█ To a large extent *Emmons* is limited to its unique facts, and is not helpful to a proper resolution of the dispute in this case. If any general principle is to be distilled from the opinion, it is that the doctrine of illegality will not bar enforcement of a contract where the public interests promoting the statute are not advanced by rendering the agreement unenforceable. Indeed, there appears to be little in *Emmons* that is pertinent to the in pari delicto exception specifically.

Neither is *Cain* controlling here. To be sure, *Cain* is properly read as holding that a determination of whether the parties are in pari delicto involves an analysis of the *relative culpability* of each. (*Cain, supra,* 131 Cal.App.2d at p. 443.) However, in considering the facts of this case, we agree with the trial court that, as a matter of law, the parties were in pari delicto.

█ First, unlike either *Cain* or *Emmons*, the agreement was entered into between two members of the State Bar. Anton not only provided legal representation for McIntosh, but also actually entered into the agreement on

his behalf as McIntosh's agent.[17] Anton, of course, was directly bound by the CPRC, including rule 1-320(A). Anton's deposition testimony that his concern over the arrangement was ameliorated by his belief that it was only a concern for Mills, whose fee was being shared, was patently incorrect. At least as to the CPRC, Anton had cause for equal concern because the rules specifically prohibited his assistance in Mills's violation of the fee-sharing rule (rule 1-120).[18] Certainly, as an agent, Anton was not obligated to negotiate an illegal agreement for McIntosh. (See generally Rest.2d Agency, § 411.)

As importantly, the extent of Anton's knowledge as to the illegal nature of the fee-sharing agreement is imputed to McIntosh by law. "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." (Civ. Code, § 2332.) This doctrine of imputed knowledge was discussed by the court in *Columbia Pictures Corp. v. DeToth* (1948) 87 Cal.App.2d 620 [197 P.2d 580], in which the court explained: "The fact that the knowledge acquired by the agent was not actually communicated to the principal, as contended by appellant, does not prevent operation of the rule. The knowledge is, in law, imputed to the principal. The agent may have been guilty of a breach of duty to his principal, yet the knowledge has the same effect as to third persons as though his duty had been faithfully performed. *The agent acting within the scope of his authority, is, as to the matters existing therein during the course of the agency, the principal himself.* [Citations.]" (*Id.* at p. 630, italics added.)

■ Thus, unlike *Cain*, in which the nonlawyer private investigator was presumably unaware of the illegal nature of the fee-sharing agreement, here another member of the State Bar actually entered into the contract with Mills on McIntosh's behalf. Furthermore and separate from that fact, Anton's awareness of the illegality of the agreement is directly imputed to McIntosh. Under these facts, the parties are indeed in pari delicto, and McIntosh is barred from enforcing his agreement with Mills.[19]

---

[17] While Anton acted as both legal counsel for McIntosh and as his agent, the fact that McIntosh was represented by a member of the State Bar in connection with the transaction is itself sufficient to distinguish this case factually from either *Cain* or *Emmons*.

[18] "A member shall not knowingly assist in, solicit, or induce any violation of these rules or the State Bar Act." (CPRC, rule 1-120.)

[19] Yet, McIntosh argues that this rule of imputation does not apply here because the issue of blameworthiness affects his good faith which is premised on the state of his actual knowledge, citing *Harte v. United Benefit Life Ins. Co.* (1967) 66 Cal.2d 148, 153 [56 Cal.Rptr. 889, 424 P.2d 329]. This exception to the exception can hardly be applied here where McIntosh, in conspiracy with two attorneys, deliberately tried to shield himself from his agent's knowledge in an ill-conceived plan to perpetuate an aura of innocence.

Furthermore, unlike *Emmons*, where the bar association's legal referral program—the party seeking to enforce the illegal agreement—was wholly without moral blame, McIntosh's own conduct renders him as legally blameworthy as Mills in the pursuit of the contract's objective. Much of McIntosh's briefing on appeal is spent trying to minimize the meaning and effect of his deposition testimony in the underlying litigation against Bank of America. His argument ebbs and flows from first, contending that his testimony under oath was not really disingenuous, or at worst, perjurious, to later arguing the record at least raises a triable issue of fact as to his degree of culpability sufficient to defeat Mills's motion.

If true, the entire affair surrounding the alleged sharing of Mills's attorney fee, based on the testimony of at least McIntosh and Anton, is nothing less than an appalling abuse of this state's civil justice system by all three principals: Mills, Anton, *and McIntosh*. The summary judgment record reveals that the parties jointly planned a scheme by which McIntosh would illegally share in the potential financial benefits of class action litigation. Special efforts were taken by all to shield McIntosh, not from the fact that he would be compensated for his work in assisting Mills prepare the litigation, but only from the precise details of the fee-sharing arrangement. The purpose of the parties' machinations was a deliberate effort to keep the existence of the fee-sharing agreement, and the details of the deal, from Bank of America and its counsel, and even from Mills's own law partners. Keeping the agreement secret would hopefully avoid the potential impeachment of McIntosh by cloaking his testimony in the class litigation with a false sense of impartiality, and also in preventing the "inappropriate" nature of the agreement from seeing the light of day.

As if this were not enough, McIntosh's dogged determination to stop the existence of the agreement from being revealed to Bank of America apparently led him to lie in his deposition. This is hardly a harsh assessment on our part, particularly given that McIntosh denied unequivocally that he was promised or told he would receive any remuneration as a result of his work on the case for Mills:

"Q: Have you been promised any payment in connection with this litigation?

"A: No.

"[¶] . . . [¶]

"Q: Have you been told that there's any possibility that you'll receive any money whatsoever as a result of this lawsuit?

"A: No. Am I missing something?

"Q: I'm just trying to distinguish between being compensated for your time testifying as opposed to any other money you might receive arising out of this lawsuit.

"A: No."

█ McIntosh's final lament is that, at worst, there is a triable issue of fact as to his culpability relative to that of Mills sufficient to require denial of the motion for summary judgment, and a jury trial. We disagree. In appropriate cases, the issue of relative wrong very well may be a question of fact. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 455, pp. 406–408.) However, the level and degree of McIntosh's own complicity in his admitted pernicious plot of deception to hide the fact that he was a party to a fee-sharing agreement demands a finding of in pari delicto as a matter of law. Having denied under oath an expectation of receiving compensation from Mills, the law will not countenance McIntosh's reversal of position, and reward his own malfeasance by recognizing a contractual right to compensation now.

## IV.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

Kline, P. J., and Haerle, J., concurred.